SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Ilda Aguas v. State of New Jersey (A-35-13) (072467)**

**Argued September 23, 2014 -- Decided February 11, 2015**

**PATTERSON, J., writing for a majority of the Court.**

In this appeal, the Court considers two issues that were generally addressed, but not expressly decided, in Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 592 (1993), and subsequent decisions: (1) the impact of an employer's anti-harassment policy on an employee's claims of negligence or recklessness and vicarious liability; and (2) the definition of a supervisor for purposes of a hostile work environment sexual harassment claim.

In 1999, the Department of Corrections (DOC) instituted a written policy prohibiting discrimination in the workplace, and mandated that all employees be trained with respect to it. The policy incorporates procedures with regard to reporting, investigating, and remediating claims of misconduct, and "encourages" employees to promptly report incidents of harassment. Plaintiff, a corrections officer, was hired in 2004, and received a copy of the policy.

Plaintiff was supervised by Darryl McClish, the highest-ranking supervisor during her shift. McClish oversaw the work of sixty employees, and was assisted by two male officers, Sergeant Hill and Sergeant Sands. Plaintiff alleges that, beginning in October 2009, McClish sexually harassed her on several occasions, and, on one occasion, Hill made inappropriate comments toward her and directed a female officer to pat-frisk her. The parties dispute the timing of plaintiff's reports of sexual harassment, and plaintiff did not file a written complaint with the DOC. On March 8, 2010, the DOC's Equal Employment Division (EED) advised plaintiff that it had initiated an investigation of her verbal complaint of sexual harassment. After several weeks and twenty interviews, the EED investigator ultimately concluded that plaintiff's allegations were unsubstantiated.

On March 10, 2010, two days after the EED commenced its investigation, plaintiff filed this action alleging that McClish and Hill subjected her to a hostile work environment based on her gender, and that the State retaliated against her because of her objections to that harassment, in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49 (LAD). Plaintiff did not allege that the DOC took any tangible employment action against her. In its answer, the State pled, as affirmative defenses, its "prompt and remedial action" in response to plaintiff's claim, its policy against discrimination, harassment and retaliation, and its "thorough investigation" of plaintiff's complaint. Following discovery, the trial court granted summary judgment to the State. The court held that plaintiff had presented a prima facie showing that she had been subjected to severe and pervasive sexual harassment, and that the conduct created a hostile or abusive work environment for her. It concluded, however, that the State had established an affirmative defense, determining that the DOC's policy required the filing of a written complaint by an employee. The trial court thus held that Plaintiff had failed to take steps required by the policy.

Plaintiff appealed, and an Appellate Division panel affirmed the trial court's grant of summary judgment. The panel agreed with the trial court that the State had established an affirmative defense, and rejected plaintiff's claim that the State was liable under the agency principles of Restatement § 219(2)(d), holding that plaintiff had failed to show that McClish used his authority to control her day-to-day working environment to aid his sexual harassment of her. The Court granted plaintiff's petition for certification. 216 N.J. 86 (2013).

**HELD**: For claims alleging vicarious liability for supervisory sexual harassment under Restatement § 219(2)(d), the Court adopts as the governing standard the test set forth by the United States Supreme Court in Burlington Industries v. Ellerth, 524 U.S. 742, 765 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998). The employer in a hostile work environment sexual harassment case may assert as an affirmative defense that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise," provided that the employer has not taken an adverse tangible employment action against the plaintiff employee.

1. In Lehmann v. Toys 'R' Us, Inc., this Court held that an employer may be vicariously liable, in accordance with principles of agency law, for sexual harassment committed by a supervisor that results in a hostile work environment. 132 N.J. 587, 592 (1993). The agency principles adopted by the Court in Lehmann are set forth in Restatement § 219, and, since this Court's decision in Lehmann, courts have recognized two primary categories of claims against employers for sexual harassment committed by their employees under Restatement § 219: (1) direct causes of action against the employer for negligence or recklessness under Restatement § 219(2)(b), and (2) claims for vicarious liability under Restatement § 219(2)(d). (pp. 17-22)

2. The Court turns first to plaintiff's claim for negligence and recklessness under Restatement § 219(2)(b). In Gaines v. Bellino, 173 N.J. 301, 312-14 (2002), the Court identified five factors that are relevant to a negligence claim against an employer in a sexual harassment case. Under the Gaines analysis, the DOC's anti-harassment policy is relevant to the elements of plaintiff's Restatement § 219(2)(b) cause of action. Thus, if plaintiff's negligence and recklessness claim is challenged on remand, or is tried before a jury, evidence of the State's anti-harassment policy should be considered in accordance with the factors identified in Gaines. (pp. 23-25)

3. With regard to claims pursuant to Restatement § 219(d)(2), the Court's prior jurisprudence strongly supports the availability of an affirmative defense, based on the employer's creation and enforcement of an effective policy against sexual harassment, in a vicarious liability claim based on Restatement § 219(d)(2). Although the Court did not delineate in Lehmann the precise role that an anti-sexual harassment policy should play in a vicarious liability sexual harassment case brought under Restatement § 219(2)(d), it foresaw a fact-specific inquiry in which the employer's implementation of a meaningful anti-harassment policy, or its failure to do so, would be, in many cases, an important factor. The Court's subsequent authority affirms this principle. See, e.g., Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 113, 120-21 (1999); Gaines, supra, 173 N.J. at 320. (pp. 25-30)

4. As in other LAD analyses, the Court also considers federal law construing Title VII with respect to vicarious liability claims premised on principles of agency. In Ellerth and Faragher, the Supreme Court integrated the agency principles of Restatement § 219(2)(d) with the legislative objective of deterring sexual harassment by promoting effective anti-harassment policies, and adopted a two-pronged affirmative defense to liability or damages. This Court concurs with the Supreme Court that the Ellerth/Faragher analysis provides a fair and practical framework for supervisor sexual harassment cases, and, accordingly, expressly adopts the Ellerth/Faragher analysis for such matters in which a hostile work environment is claimed pursuant to the LAD, and no tangible employment action is taken. Thus, in further proceedings in this case, the State may avoid vicarious liability under Restatement § 219(2)(d) by demonstrating by a preponderance of the evidence that the DOC exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the DOC, or to avoid harm otherwise. (pp. 31-42)

5. This matter also presents a second issue, namely the definition of a supervisor for purposes of claims based on sexual harassment giving rise to a hostile work environment. The Court in Lehmann did not expressly define "supervisor" for these purposes. It alluded, however, to the "power delegated to [a supervisor] to control the day-to-day working environment," and distinguished between a "supervisor" and the employer's "upper management." Lehmann, supra, 132 N.J. at 620, 622-23. The Court thus suggested that the term supervisor included a broader range of managers than the senior executives who set policy for an employer. In its decision today, the Court, therefore, declines to adopt the more restrictive definition of "supervisor" recently prescribed by the Supreme Court majority in Vance v. Ball State University, 133 S. Ct. 2434, 2443 (2013). The Court agrees instead with the Equal Employment Opportunity Commission, and adopts its more expansive definition that includes not only employees granted the authority to make tangible employment decisions, but also those placed in charge of the complainant's daily work activities. Thus, an allegedly harassing employee is the complainant's supervisor if that employee had the authority to take or recommend tangible employment actions affecting the complaining employee, or to direct the complainant's day-to-day activities in the workplace. (pp. 42-48)

6. If the trial court is called upon to determine plaintiff's punitive damages claim on remand, it should assess whether plaintiff has shown by clear and convincing evidence that the DOC committed "egregious conduct," and if so, whether she has presented clear and convincing evidence that "upper management" either participated directly in sexual harassment, or showed "willful indifference." The court should assess such claims in accordance with the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17 (PDA) and this Court's prior holdings. (pp. 48-51)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**JUSTICE ALBIN**, **DISSENTING**, joined by **CHIEF JUSTICE RABNER**, expresses the view that the LAD, under Lehmann, provided greater protection than federal law in hostile work environment cases, and that Lehmann did not authorize an affirmative defense applied to supervisory liability under the Restatement § 219(2)(d) approach.

**JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion in which CHIEF JUSTICE RABNER joins.**

ILDA AGUAS,

     Plaintiff-Appellant,

       v.

STATE OF NEW JERSEY,

     Defendant-Respondent.

     Argued September 23, 2014 – Decided February 11, 2015

     On certification to the Superior Court, Appellate Division.

     Paul R. Castronovo argued the cause for appellant (Castronovo & McKinney, attorneys; Mr. Castronovo and Sara Fern Meil, of counsel; Mr. Castronovo, Ms. Meil, and Megan Frese Porio, on the briefs).

     Jessica S. Allen, Assistant Attorney General, argued the cause for respondent (John J. Hoffman, Attorney General of New Jersey, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Gail R. Beran, Deputy Attorney General, on the briefs).

     Thaddeus P. Mikulski, Jr., argued the cause for amicus curiae National Employment Lawyers Association of New Jersey.

     Mark A. Saloman argued the cause for amicus curiae Employers Association of New Jersey (Proskauer Rose, attorneys; Mr. Saloman, Nicholas M. Tamburri, and John J. Sarno, on the brief).

    JUSTICE PATTERSON delivered the opinion of the Court.

1

In Lehmann v. Toys 'R' Us, Inc., this Court held that an employer may be vicariously liable, in accordance with principles of agency law, for sexual harassment committed by a supervisor that results in a hostile work environment.  132 N.J. 587, 592 (1993).  Citing Restatement (Second) of Agency § 219(2) [hereinafter Restatement], the Court held that when a supervisor acts beyond "the scope of his or her employment, the employer will be vicariously liable if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship."  Id. at 624.

In this case, plaintiff Ilda Aguas (Aguas), a corrections officer, alleges that two of her supervisors subjected her to sexual harassment in the workplace.  Aguas asserted negligence and vicarious liability claims premised on the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49 (LAD).  She appeals from the Appellate Division's decision affirming the trial court's grant of summary judgment dismissing her claims.

Aguas's appeal requires that we determine two issues that were generally addressed, but not expressly decided, in Lehmann and subsequent decisions by this Court.  First, we address the impact of an employer's anti-harassment policy on an employee's negligence or recklessness claim under Restatement § 219(2)(b),

2

and on a vicarious liability claim under Restatement § 219(2)(d). We reaffirm that an employer's implementation and enforcement of an effective anti-harassment policy, or its failure to maintain such a policy, is a critical factor in determining negligence and recklessness claims under Restatement § 219(2)(b).

For claims alleging vicarious liability for supervisory sexual harassment under Restatement § 219(2)(d), we adopt as the governing standard the test set forth by the United States Supreme Court in Burlington Industries v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633, 655 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998). Under the Ellerth/Faragher analysis, the employer in a hostile work environment sexual harassment case may assert as an affirmative defense to vicarious liability that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise," provided that the employer has not taken an adverse tangible employment action against the plaintiff employee. Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655; Faragher,

3

<u>supra</u>, 524 <u>U.S.</u> at 807-08, 118 <u>S. Ct.</u> at 2292-93, 141 <u>L. Ed.</u> 2d at 689.

The <u>Ellerth</u>/<u>Faragher</u> affirmative defense derives from agency principles adopted by this Court in <u>Lehmann</u>. It furthers the LAD's purpose of eliminating sexual harassment in the workplace by motivating employers to maintain effective anti-harassment policies, and by encouraging employees to take prompt action against harassing supervisors in accordance with those policies. <u>Lehmann</u>, <u>supra</u>, 132 <u>N.J.</u> at 626. The affirmative defense is consonant with this Court's prior jurisprudence and advances the legislative goal of the LAD.

Second, we consider the factors that trial courts should apply when determining whether an employee, accused of sexually harassing another employee, is that individual's supervisor -- a term undefined in the LAD and our prior case law -- for purposes of a hostile work environment sexual harassment claim. We hold that an allegedly harassing employee is the complainant's supervisor if that employee had the authority to take or recommend tangible employment actions affecting the complaining employee, or to direct the complainant's day-to-day activities in the workplace.

So that the trial court may decide this case in accordance with these standards, we reverse the Appellate Division's

4

affirmance of summary judgment dismissing Aguas's claims and remand this matter to the trial court for further proceedings.

I.

Effective on December 16, 1999, the New Jersey Department of Corrections (DOC) instituted a written policy prohibiting discrimination in the workplace and mandated that all employees be trained with respect to it. The policy states a commitment "to providing every State employee and prospective employee with a work environment free from discrimination or harassment." It proscribes "sexual (or gender-based) harassment of any kind[.]" Among other prohibited behaviors, the policy bars "[u]nwanted physical contact such as intentional touching, grabbing, pinching, brushing against another's body or impeding or blocking movement," as well as "[v]erbal, written, or electronic sexually suggestive or obscene comments, jokes or propositions[.]"

The DOC policy imposes special responsibilities on supervisors. It charges supervisors to ensure "a work environment that is free from any form of discrimination/harassment" and subjects supervisors who fail to meet its requirements with sanctions that may include termination of employment.

The DOC policy incorporates "the State of New Jersey Model Procedures with regard to reporting, investigating, and where

appropriate, remediating claims of discrimination/harassment," pursuant to N.J.A.C. 4A:7-3.2.[1]  It requires the designation of a responsible individual or individuals to handle employee discrimination and harassment complaints.  The policy "encourages" employees subjected to harassment to "promptly report the incident(s) to either a supervisor, or directly to the [DOC's] Equal Employment Division/Affirmative Action Officer," without specifying that the employee must report the incident in writing.  The policy mandates that the DOC conduct investigations of such complaints "in a prompt, thorough and impartial manner" that respects "the privacy of all persons involved."

The DOC Commissioner is charged with making a final determination as to whether a policy violation has occurred.  If a complaint is substantiated, the DOC is required to "take prompt and appropriate remedial action to stop the behavior and deter its reoccurrence," including interim separation of the alleged harasser from the complainant employee pending a final determination.  The DOC policy bars retaliation against a complaining employee.

---

[1] N.J.A.C. 4A:7-3.1 generally sets forth the State's policy prohibiting hostile work environment harassment and other forms of discrimination in the workplace.  The State policy governs all State employees and all employment practices, and mandates that every State agency implement procedures for internal complaints of harassment.  N.J.A.C. 4A:7-3.1(a), (g).

6

In 2004, Aguas was hired by the DOC as a Corrections Officer Recruit. The following year, she became a Senior Corrections Officer, assigned to the third shift, 10:00 p.m. to 6:00 a.m., at the Edna Mahan Correctional Facility for Women (Edna Mahan). Aguas acknowledged that she received a copy of the DOC anti-discrimination and harassment policy, but denied receiving training with respect to that policy. However, Aguas twice instituted written complaints pursuant to the DOC's anti-discrimination policy, the first a discrimination complaint filed in 2005 against a female co-worker, and the second a workplace violence complaint filed in 2007 against a different female co-worker. The DOC found both complaints to be unsubstantiated.

Aguas was supervised by Darryl McClish (McClish), an Area Lieutenant who has worked for the DOC since 1989 and at Edna Mahan since 2009. During the third shift, McClish was the highest-ranking supervisor at the correctional facility, overseeing the work of sixty employees. He was assisted in that role by two male officers, Sergeant Robin Hill (Hill) and Sergeant Eric Sands (Sands).

Aguas alleges that McClish sexually harassed her on several occasions, beginning in October 2009. She asserts that on one evening that month, as she completed her shift and left the facility, McClish stood next to her very closely and asked "are

7

we going to a telly," which she interpreted as a reference to a motel. Aguas contends that McClish then made a comment about another officer, Lieutenant Rudolph Walz (Walz), suggesting that Aguas had a romantic relationship with Walz. McClish denies this allegation.

Later the same evening, Aguas took her handcuffs home in contravention of the DOC policy, and McClish called and demanded her immediate return to the correctional facility. Aguas alleges that when she returned with the handcuffs, McClish sniffed the handcuffs and asked, "[w]here you been? If you just want to borrow them, let me know." She contends that McClish then "sat in [her] lap face-to-face while blowing his whistle and gave her a 'lap dance' by grinding his pelvis into [her] and shaking his face close to her face." Aguas alleges that McClish persisted in this behavior despite her warning to stop, and that another corrections officer and a lieutenant on the scene purposely looked in the other direction while the conduct was occurring. McClish agrees that he ordered Aguas to return to the facility with the handcuffs, but otherwise denies Aguas's allegations regarding this incident, and denies that he touched Aguas with his waist, hip or groin on any occasion.

Aguas next alleges that later in the same month, McClish massaged her shoulders, out of view of any other employees, when he and Aguas were conducting nightly rounds of the corrections

8

facility.  She asserts that he then "stuck out his buttocks toward [Aguas], flexed his arms and said, '[d]o me a favor and take my radio off my hip.  I worked out and I'm sore,'" a direction that she declined to follow.  McClish denies both allegations.

Aguas contends that a few days after that incident, McClish commented twice, in her presence, about her alleged relationship with Walz.  She asserts that immediately after she complained to McClish about the comments, McClish approached her from behind, "put her in a hold with her hands behind her back and pulled up to her shoulder blades."  According to Aguas, McClish then "bent [Aguas] over the table with his genital area touching [her] buttocks and repeatedly said, '[w]hat are you going to do?'"  Aguas asserts that she immediately kicked and head-butted McClish repeatedly and that the two fell to the floor, prompting McClish to release her.  She alleges that McClish then "started bobbing like a boxer" and repeated his question, "[w]hat are you going to do?"

According to Aguas, when she returned from a trip to the bathroom a few minutes later, "McClish got very close behind [her] and start[ed] dancing, whooping, waving his arms, and blowing his whistle while repeatedly saying '[w]oohoo!' as if [she] was a stripper."  Aguas claims that McClish then made a derogatory comment about Walz.  She asserts that when she

confronted McClish about this behavior days later, telling

McClish that his alleged actions made her feel uncomfortable and

"like a whore, like a slut," he responded that he was not sorry.

McClish denies these allegations in their entirety, and

maintains that the conversations recounted by Aguas did not

occur.

Aguas contends that on January 23, 2010, she set off the

alarm in the metal detector at Edna Mahan.  According to Aguas,

Hill asked her whether she had "piercings in [her] breasts

because I know you don't need an underwire bra," and directed a

female officer to repeatedly pat-frisk Aguas.  Hill testified

that, in compliance with the DOC policy, he ordered a female

officer to pat-frisk Aguas after she failed to clear the metal

detector.[2]  Hill denied making the remark alleged by Aguas.

Finally, Aguas contends that Sands subjected her to "hyper-

scrutiny," selectively reprimanding her for uniform violations

committed by several officers, for smoking outside on her break

with a sweater around her shoulders, and for not carrying a red

pen.

---

[2] The DOC policy then in effect required officers to pass through
a metal detector before entering the facility, and provided that
if an individual failed to clear the metal detector after four
attempts, security would be notified and the officer would be
pat-frisked by another officer of the same gender.

10

The parties dispute the timing of Aguas's reporting of her sexual harassment allegations. Aguas contends that she reported McClish's harassment to Walz on several occasions beginning in October 2009. Walz testified, however, that Aguas reported to him only the conversation with Hill involving the metal detector, and the excessive scrutiny of her uniform, and that she did not complain to him at any time about alleged sexual harassment by McClish.

Aguas reported her allegations that McClish sexually harassed her to Captain and Acting Chief Robert Ryan (Ryan), the highest officer in command, and Ryan advised her to meet with Assistant Administrator Helen Adams (Adams). Aguas asserts that she rejected Adams's advice to report the harassment in writing because she feared retaliation. She declined the DOC's alternative suggestion that she participate in a group meeting with the DOC officials, McClish, Sands and Hill. Aguas contends that Adams gave her forms to prepare a written report and a referral to the facility's psychologist.

According to Aguas, she became distraught at the meeting with Adams and was subsequently hospitalized for a migraine and placed on medical leave. A few days later, Aguas received two text messages from a fellow Edna Mahan officer, which she interpreted as a warning not to file a written complaint. Aguas did not file a written complaint with the DOC.

11

On March 8, 2010, the DOC's Equal Employment Division (EED) advised Aguas in writing that it had initiated an investigation of her verbal complaint of sexual harassment.  Over the next several weeks, an EED investigator interviewed Aguas, McClish, Walz and seventeen other witnesses, and obtained statements from others.  The EED investigator summarized her findings in a report dated April 21, 2010.  The investigator concluded that Aguas's allegations were unsubstantiated, and advised Aguas of that conclusion in writing.

## II.

On March 10, 2010, two days after the EED commenced its investigation of her complaints, Aguas filed this action.  She named the State as the sole defendant and asserted claims under the LAD for compensatory and punitive damages and other relief.  Aguas alleged that the sexual harassment by McClish and Hill subjected her to a hostile work environment based on her gender, and that the State retaliated against her because of her objections to that harassment, in violation of the LAD.  Aguas did not allege that the DOC took any tangible employment action against her.

In its answer, the State pled, as affirmative defenses, its "prompt and remedial action" in response to Aguas's claim, its policy against discrimination, harassment and retaliation, and its "thorough investigation" of Aguas's complaint.

12

Following discovery, the trial court granted the State's motion for summary judgment. The court held that Aguas had presented a prima facie showing that she had been subjected to severe and pervasive sexual harassment, and that the conduct created a hostile or abusive work environment for her. It concluded, however, that the State had established an affirmative defense. The court noted that the DOC had a written policy against discrimination, harassment and retaliation that included a procedure for reporting through the EED, a procedure that Aguas had used in the past. The trial court construed the policy to require the filing of a written complaint by an employee. It held that Aguas had failed to take steps required by the policy. The trial court therefore dismissed Aguas's LAD sexual harassment claims, based on theories of negligence and recklessness, as well as vicarious liability. Due to its rejection of Aguas's claims for compensatory damages, the trial court also granted summary judgment dismissing Aguas's claim for punitive damages.[3]

Aguas appealed, and an Appellate Division panel affirmed the trial court's grant of summary judgment. The panel concluded that the State exercised due care in its investigation

---

[3] In a decision that was not appealed, the trial court also dismissed Aguas's retaliation claim.

of Aguas's claim and concurred with the trial court's dismissal of Aguas's negligence and recklessness claim.  It also agreed with the trial court that the State had established an affirmative defense, by indisputable proof, based upon the DOC's adoption and implementation of a policy against discrimination and sexual harassment, a policy that Aguas admittedly received in writing annually.  The panel rejected Aguas's claim that the State was liable under the agency principles of Restatement § 219(2)(d), holding that Aguas had failed to show that McClish used his authority to control her day-to-day working environment to aid his sexual harassment of her.  It also affirmed the trial court's dismissal of Aguas's claim for punitive damages.

We granted Aguas's petition for certification.  Aguas v. State, 216 N.J. 86 (2013).

### III.

Aguas argues that the Appellate Division created a novel test, in contravention of this Court's decision in Lehmann and public policy, which requires an employee to file a formal report under the employer's policy before pursuing legal remedies.  She concedes that an employer may present evidence of its implementation and enforcement of an explicit policy against sexual harassment and its provision of an effective investigatory and remedial procedure in defense of a negligence claim.  She denies that a plaintiff in a sexual harassment case

14

has the burden of proof, and instead contends that the employer's policy gives rise to an affirmative defense as to which the defendant has the burden of proof. Aguas argues that in any event, the State cannot establish such a defense based on the record in this case.

Aguas contends that the Appellate Division misapplied Lehmann by declining to find the State vicariously liable based on principles of agency. She argues that under Lehmann, when a supervisor sexually harasses a subordinate, the employer is presumed liable whether or not the subordinate reports the harassment, and that the Ellerth/Faragher analysis does not govern cases involving supervisors under the LAD. Finally, Aguas contends that the Appellate Division improperly affirmed the dismissal of her claim for punitive damages because she established an underlying violation of the LAD.

The State counters that the DOC implemented an effective anti-sexual harassment policy, enforced that policy and took immediate remedial action in response to Aguas's complaint, and that it was Aguas's duty to utilize the grievance procedure. It argues that sexual harassment by a supervisor is not a per se violation of the LAD except where a tangible employment action is taken against the employee who has alleged harassment. The State asserts that the United States Supreme Court's Ellerth/Faragher analysis applies to cases involving

15

supervisors, and that unless the supervisor's harassment prompts a tangible employment action and the plaintiff seeks equitable relief, the employer may assert an affirmative defense under that analysis.

Amicus curiae National Employment Lawyers Association of New Jersey (NELA) argues that the Appellate Division contravened Lehmann and other authority by holding that McClish, the highest-level manager on his shift at Edna Mahan, lacked sufficient authority to be considered a supervisor for purposes of vicarious liability. NELA asserts that the Appellate Division improperly focused on McClish's authority to discipline Aguas and affect her economic status, rather than on his capacity to oversee her day-to-day work. NELA argues that New Jersey law does not require an employee who is a victim of sexual harassment to formally report the harassment in writing in order to trigger an investigation and remediation.

Amicus curiae Employers Association of New Jersey (EANJ) urges the Court to hold that an employer cannot, as a matter of law, be liable for a hostile work environment under the LAD if it took prompt remedial action in response to an employee's complaint of sexual harassment. EANJ argues that the DOC satisfied its duty of care by implementing and enforcing a detailed procedure. It asserts that Aguas should be barred from recovering under the LAD because she unreasonably failed to take

advantage of preventive and corrective measures that were available to her.

IV.

A.

We first consider the impact of the DOC's anti-harassment policy on Aguas's two claims for sexual harassment giving rise to a hostile work environment:  her direct claim for negligence and recklessness against the State based on Restatement § 219(2)(b), and her claim that the State is vicariously liable for sexual harassment committed by McClish and Hill under Restatement § 219(2)(d).  The decisions that defined these claims provide the setting for our analysis.

In Lehmann, supra, this Court recognized sexual harassment in the workplace as a form of discrimination that is prohibited by the LAD.  132 N.J. at 601 (citing Meritor Sav. Bank v. Vinson, FSB, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 555-56 (1990)).  The Court recognized two forms of sexual harassment that are actionable under the LAD.  The first is "quid pro quo sexual harassment," in which "an employer attempts to make an employee's submission to sexual demands a condition of his or her employment."  Ibid.  Aguas does not assert a quid pro quo harassment claim in this case.

17

The second cause of action for sexual harassment, at issue here, is a claim for "hostile work environment sexual harassment." Ibid. To prove this claim, a plaintiff must show that the harassment "(1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04 (emphasis omitted).

As the Court identified the elements of a hostile work environment sexual harassment claim in Lehmann, it also addressed the issue of employer liability for sexual harassment by a supervisor or co-employee. Id. at 615-24. It held that "the employer is directly and strictly liable for all equitable damages and relief" to the extent that an employee subjected to discrimination or sexual harassment seeks equitable remedies, that is, restoration "to the terms, conditions, and privileges of employment the employee would have enjoyed but for the workplace discrimination or harassment." Id. at 617. With respect to claims for damages, however, the Court declined to hold an employer strictly liable for sexual harassment committed by its employee. Ibid. Instead of strict liability, the Court adopted as the measure of employer liability a fact-sensitive standard derived from the law of agency. Id. at 620.

18

In its rejection of strict liability, the Court relied on Meritor, then the United States Supreme Court's sole authority on hostile work environment sexual harassment cases. Id. at 618-19 (citing Meritor Sav. Bank, supra, 477 U.S. at 72, 106 S. Ct. at 2408, 91 L. Ed. 2d at 63).[4] In Meritor, supra, the United States Supreme Court majority declined to impose strict liability on employers in hostile work environment harassment cases and instead invoked the agency principles set forth in Restatement §§ 219-237. 477 U.S. at 69-70, 72, 106 S. Ct. at 2407-08, 91 L. Ed. 2d at 61, 63. In a concurring opinion, Justice Marshall urged the adoption of a strict liability standard in both quid pro quo and hostile work environment cases. Id. at 74-78, 106 S. Ct. at 2409-11, 91 L. Ed. 2d at 64-66 (Marshall, J., concurring). Justice Stevens joined both

---

[4] The Court "has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e to § 2000e-17 ('Title VII'), as 'a key source of interpretive authority.'" Id. at 600 (quoting Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990)); see also Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 261-63 (2010). That rule is not absolute; this Court has declined to follow federal law when that law sharply diverges from prior authority construing the LAD. See, e.g., Alexander v. Seton Hall Univ., 204 N.J. 219, 232-35 (2010) (declining to follow United States Supreme Court's approach to wage discrimination claims in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007), in light of "settled prior case law" contrary to the Supreme Court's holding.) Thus, we evaluate the analysis adopted by federal courts construing Title VII to determine whether that analysis furthers the objectives of the LAD and comports with our prior holdings.

19

opinions because he shared the majority's rejection of strict liability and the concurring opinion's construction of Title VII. Id. at 73, 106 S. Ct. at 2409, 91 L. Ed. 2d at 64 (Stevens, J., concurring).

Contrary to the argument of our dissenting colleagues, who contend that in Lehmann the Court "declined to follow" the Meritor majority in favor of Justice Marshall's strict liability approach, post at ___ (slip op. at 9-10), the Court actually embraced the agency analysis of the majority in Meritor. It concurred "with Justice Stevens that there is no inherent contradiction between the majority's adoption of agency principles and Justice Marshall's observation that a supervisor's delegated authority often goes beyond the power to hire and fire." Lehmann, supra, 132 N.J. at 619. The Court noted:

> We recognize that although we have declined to hold employers strictly liable for hostile work environment sexual harassment by supervisors, we have created a standard that may often result in employers being held vicariously liable for such harassment. We note that there is an important difference between strict liability and vicarious liability under agency law. Under a strict liability standard, an employer would always be liable for supervisory hostile work environment sexual harassment, regardless of the specific facts of the case. We think that in some cases strict liability would be unjust -- for example, "where a supervisor rapes one of his subordinates in the workplace."

20

[<u>Id.</u> at 623-24 (emphasis in original) (quoting <u>Lehmann v. Toys 'R' Us, Inc.</u>, 255 <u>N.J. Super.</u> 616, 661 (App. Div. 1992) (Skillman, J.A.D., dissenting)).]

The agency principles adopted by the Court in <u>Lehmann</u> are set forth in <u>Restatement</u> § 219, which recognizes four exceptions to the general rule that an employer is not liable for its employee's conduct beyond the scope of his or her employment:

> 1.  A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> 2.  A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> > (a) the master intended the conduct or the consequences, or
> >
> > (b) the master was negligent or reckless, or
> >
> > (c) the conduct violated a non-delegable duty of the master, or
> >
> > (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

[<u>Restatement</u> § 219.]

As the Court noted in <u>Lehmann</u>, <u>supra</u>, the agency principles of <u>Restatement</u> § 219 "are sufficiently well-established to provide employers with notice of their potential liability, and also sufficiently flexible to provide just results in the great

21

variety of factual circumstances presented by sexual harassment cases and to accomplish the purposes of the LAD." 132 N.J. at 619.

Since this Court's decision in Lehmann, our courts have recognized two primary categories of claims against employers for sexual harassment committed by their employees under Restatement § 219. The first is a direct cause of action against the employer for negligence or recklessness under Restatement § 219(2)(b). See, e.g., Gaines v. Bellino, 173 N.J. 301, 312-14 (2002). The second is a claim for vicarious liability under Restatement § 219(2)(d). See ibid. Although direct claims for negligence or recklessness under Restatement § 219(2)(b) and claims for vicarious liability under Restatement § 219(2)(d) are often discussed in tandem, they are analytically distinct from and independent of one another. When both are pled in a sexual harassment action, as they are in this case, the two claims must be addressed separately.

Guided by our jurisprudence and agency principles adopted as the benchmark for employer liability, we consider in turn the relevance of the DOC's anti-harassment policy to Aguas's negligence and recklessness claim based on Restatement § 219(2)(b), and the role of that policy in Aguas's vicarious liability claim premised upon Restatement § 219(2)(d).

B.

22

As the parties agree, the DOC's anti-harassment policy is central to the determination of Aguas's claim for negligence and recklessness under Restatement § 219(2)(b). The negligence standard imposes on Aguas the burden to prove that the State failed to exercise due care with respect to sexual harassment in the workplace, that its breach of the duty of due care caused the plaintiff's harm, and that she sustained damages. See generally, Komlodi v. Picciano, 217 N.J. 387, 409 (2014); Robinson v. Vivirito, 217 N.J. 199, 208 (2014) (citing Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013); Weinberg v. Dinger, 106 N.J. 469, 484 (1987)).

In Gaines, supra, the Court identified five factors that are relevant to a negligence claim against an employer in a sexual harassment case. 173 N.J at 313.

> Those factors include[] the existence of: (1) formal policies prohibiting harassment in the workplace; (2) complaint structures for employees' use, both formal and informal in nature; (3) anti-harassment training, which must be mandatory for supervisors and managers, and must be available to all employees of the organization; (4) the existence of effective sensing or monitoring mechanisms to check the trustworthiness of the policies and complaint structures; and (5) an unequivocal commitment from the highest levels of the employer that harassment would not be tolerated, and demonstration of that policy commitment by consistent practice.
>
> [Ibid. (citing Lehmann, supra, 132 N.J. at 620).]

23

Applying that standard to the Restatement § 219(2)(b) negligence claim before it, the Court found that because of the deficiencies in the employer's policy, a genuine issue of material fact barred summary judgment with respect to two of the factors relevant to a negligence claim against an employer under Restatement § 219(2)(b). Id. at 315-17, 319.

The Court further noted that Lehmann had recognized that "the existence of effective preventative mechanisms may provide evidence of due care on the part of the employer." Id. at 314 (citing Lehmann, supra, 173 N.J. at 621-22). It observed that in Lehmann, the Court declined "to hold that the absence of such mechanisms, or any part of them, automatically constituted negligence, and [] similarly rejected the converse proposition that the presence of such mechanisms categorically demonstrated the absence of negligence." Ibid. (citing Lehmann, supra, 132 N.J. at 621-22). As the Court stated in Gaines, however, "[t]he efficacy of an employer's remedial program is highly pertinent to an employer's defense." Ibid.

Under the Gaines analysis, the DOC's anti-harassment policy is relevant to the elements of Aguas's Restatement § 219(2)(b) cause of action. If Aguas's negligence and recklessness claim under Restatement § 219(2)(b) is challenged in a dispositive motion on remand, or is tried before a jury, evidence of the

24

State's anti-harassment policy should be considered in accordance with the factors identified in Gaines.

C.

Under Restatement § 219(d)(2), an employee may assert that the employer is vicariously liable for sexual harassment committed by its employee because the sexual harasser purported to act on the employer's behalf and "there was reliance upon [his or her] apparent authority," or because the harasser "was aided in [his or her misconduct] by the existence of an agency relation[ship]" with his or her employer.  See Lehmann, supra, 132 N.J. at 619.

In Lehmann, the Court held that a vicarious liability claim under Restatement § 219(2)(d) "requires a detailed fact-specific analysis" and stated a four-part test for the factfinder:

> 1.   Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains . . . ?
>
> 2.   Did the supervisor exercise that authority?
>
> 3.   Did the exercise of authority result in a violation of [the LAD]?
>
> 4.   Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?
>
> [Id. at 620 (citation omitted).]

25

If each of these questions are answered in the affirmative, "then the employer is vicariously liable for the supervisor's harassment under [Restatement] § 219(2)(d)." Ibid.

This Court's prior jurisprudence does not address in detail the analytical framework under which an employer's anti-harassment policy may be considered in a hostile work environment sexual harassment claim involving a supervisor. Nonetheless, that jurisprudence strongly supports the availability of an affirmative defense, based on the employer's creation and enforcement of an effective policy against sexual harassment, in a vicarious liability claim based on Restatement § 219(d)(2).

First, the Restatement provision at the heart of the Court's analysis in Lehmann sets forth agency principles that directly implicate an employer's policy, or its lack of a policy, against sexual harassment in the workplace. See id. at 619 (citing Restatement § 219(2)(d)). The existence and enforcement of a policy charging supervisors with ensuring a harassment-free workplace is central to the questions raised by Restatement § 219(2)(d): whether a harassing supervisor "purport[s] to act or to speak on behalf of the principal," whether "there was reliance upon [that supervisor's] apparent authority," and whether a harasser was "aided in accomplishing"

26

the harassment by "the existence of the agency relation."

Restatement § 219(2)(d).[5]

Second, in rejecting strict liability, the Court in Lehmann, supra, clearly envisioned that an employer would be permitted to argue that vicarious liability should not be imposed in the circumstances of the individual case. See 132 N.J. at 624 (explaining that "[u]nder agency law, an employer's liability for a supervisor's sexual harassment will depend on the facts of the case").

Third, the Court held that any legal test governing vicarious liability claims should motivate employers to create and enforce a policy against harassment. Id. at 626. The Court observed that an effective legal test allows employees "to know

---

[5] Our dissenting colleagues argue that Model Jury Charge (Civil) 2.25 demonstrates that New Jersey law rejects an affirmative defense in a supervisory sexual harassment claim against an employer. Post at ___ (slip op. at 5-7). Following Lehmann, this Court has never addressed the jury charge that should be given in a supervisory sexual harassment case. If, as the dissent suggests, the Model Jury Charge endorses a strict liability test in cases such as this, then the charge is inconsistent with Lehmann, Cavuoti and Gaines. See Lehmann, supra, 132 N.J. at 617-20; Gaines, supra, 173 N.J. at 314; Cavuoti, supra, 161 N.J. at 120-21. In fact, the jury charge cited by the dissent derives from the Lehmann Court's adoption of the inquiry set forth in Restatement § 219(2)(d): whether the supervisor "purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or was aided in accomplishing the tort by the existence of the agency relation." Restatement § 219(2)(d). The Ellerth/Faragher affirmative defense, which directly addresses that question, should be included in our Model Charge.

27

their rights in a given set of circumstances," and permits "employers to set policies and procedures that comply with that test." Id. at 603. Noting that "[c]ourtrooms are not the best place to prevent or remedy a hostile work environment," id. at 625, the Court observed:

> The most important tool in the prevention of sexual harassment is the education of both employees and employers. Consensus among employees and employers should be the goal. We think that providing employers with the incentive not only to provide voluntary compliance programs but also to insist on the effective enforcement of their programs will do much to ensure that hostile work environment discrimination claims disappear from the workplace and the courts.
>
> [Id. at 626.]

The Court's intention that its legal test motivate employers to implement and enforce "voluntary compliance programs" strongly signals that such compliance programs, if effective and enforced, may give rise to an affirmative defense to an LAD claim. Ibid.

Thus, although the Court did not delineate in Lehmann the precise role that an anti-sexual harassment policy should play in a vicarious liability sexual harassment case brought under Restatement § 219(2)(d), it foresaw a fact-specific inquiry in which the employer's implementation of a meaningful anti-harassment policy, or its failure to do so, would be, in many cases, an important factor. See id. at 620, 622-24.

28

The Court's subsequent authority affirms this principle. In Cavuoti v. New Jersey Transit Corp., a case involving the standard for an award of punitive damages against an employer in supervisor sexual harassment litigation, the Court reiterated that an employer's anti-harassment policy is a significant factor in such cases. 161 N.J. 107, 113, 120-21 (1999). This Court commented that "like the [United States] Supreme Court we have afforded a form of a safe haven for employers who promulgate and support an active, anti-harassment policy." Id. at 120-21. The Court further observed:

> A company that develops policies reflecting a lack of tolerance for harassment will have less concern about hostile work environment or punitive damages claims if its good-faith attempts include periodic publication to workers of the employer's anti-harassment policy; an effective and practical grievance process; and training sessions for workers, supervisors, and managers about how to recognize and eradicate unlawful harassment.
>
> [Id. at 121.]

Finally, in Gaines, supra, the Court expressly confirmed the availability of an affirmative defense to vicarious liability based on an effective policy against sexual harassment. It held that "[a] defendant is entitled to assert the existence of an effective anti-sexual harassment workplace policy as an affirmative defense to vicarious liability; however, material issues of disputed fact in the context of a

29

motion record can deny a defendant summary dismissal based on that defense."  173 N.J. at 320.

Notwithstanding that clear language, our dissenting colleagues inexplicably assert that the Court "never hint[ed] that an affirmative defense applied to supervisory liability under the Restatement § 219(2)(d) approach."  Post at ___ (slip op. at 7).  The dissent also asserts that in Gaines, the Court stated only that an affirmative defense is available to an employer in a negligence case under Restatement § 219(2)(b).  Post at ___ (slip op. at 8).  In fact, the Court expressly recognized in Gaines an affirmative defense to a Restatement § 219(2)(d) claim for vicarious liability.  See Gaines, supra, 173 N.J. at 320; see also Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 200 (2008) (stating that "[t]he means employed by an institution to deter harassment, and the enforcement of those means, may be considered when assessing that institution's vicarious liability").

Thus, the Court's prior case law provides important guidance with respect to this issue.  In Lehmann, Cavuoti and Gaines, the Court acknowledged the value of effective anti-harassment policies in combatting sexual harassment in the workplace, and recognized that employers will be motivated to implement and enforce such policies if their policies provide a defense to a claim of vicarious liability.  See Gaines, supra,

173 N.J. at 320; Cavuoti, supra, 161 N.J. at 120-21; Lehmann, supra, 132 N.J. at 619, 626.

As in other settings involving the LAD, we consider federal law construing Title VII with respect to this issue. In Ellerth and Faragher, the United States Supreme Court addressed Title VII vicarious liability claims premised on principles of agency. These cases, which had not been decided when this Court decided Lehmann, represent part of the evolution in federal law that has occurred as employer anti-harassment policies have become more prevalent in the workplace.

Ellerth and Faragher arose from a supervisor's alleged sexual harassment of a subordinate, which gave rise to a hostile work environment.[6] The Supreme Court confirmed that Restatement § 219(2)(d) provides the analytical framework for supervisory sexual harassment cases because "[t]he agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior."

---

[6] In Ellerth, an employee alleged that she was subjected to sexual harassment by a vice president of the company that employed her. Ellerth, supra, 524 U.S. at 747, 118 S. Ct. at 2262, 141 L. Ed. 2d at 644. In Faragher, a lifeguard sued the municipality for which she worked, alleging that her immediate supervisors sexually harassed her. Faragher, supra, 524 U.S. at 780-81, 118 S. Ct at 2280, 141 L. Ed. 2d at 672.

Faragher, supra, 524 U.S. at 803, 118 S. Ct. at 2291, 141 L. Ed. 2d at 686.

The Supreme Court noted, however, that the proper analysis "calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement . . . but rather an inquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's employment, and the reasons for the opposite view." Id. at 797, 118 S. Ct. at 2288, 141 L. Ed. 2d at 682. The Supreme Court further observed that the agency principles it espoused must be consonant with Meritor, in which it had declined to impose strict liability on employers in supervisor sexual harassment cases. Id. at 804, 118 S. Ct. at 2291, 141 L. Ed. 2d at 686 (footnote omitted); see also Ellerth, supra, 524 U.S. at 755, 118 S. Ct. at 2266, 141 L. Ed. 2d at 649. In Faragher, supra, the Court explained that "there is obviously some tension between [Meritor's] holding and the position that a supervisor's misconduct aided by supervisory authority subjects the employer to liability vicariously; if the 'aid' may be the unspoken suggestion of retaliation by misuse of supervisory authority, the risk of automatic liability is high." Faragher, supra, 524 U.S. at 804, 118 S. Ct. at 2291, 141 L. Ed. 2d at 686 (footnote omitted).

The Supreme Court identified two "basic alternatives" by which Meritor's rejection of strict liability could be reconciled with the Restatement's analysis:  a requirement that a plaintiff provide proof that the supervisor affirmatively invoked his or her authority, or the recognition of "an affirmative defense to liability in some circumstances, even when a supervisor has created the actionable environment." Ibid.  The Court rejected the first alternative, noting the vagueness and impracticality such a test:

> Application of the standard is made difficult by its malleable terminology, which can be read to either expand or limit liability in the context of supervisor harassment.  On the one hand, a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation.  See Meritor, 477 U.S. at 77, 106 S. Ct. at 2410, 91 L. Ed. 2d at 66 (Marshall, J., concurring in judgment) ("It is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates").  On the other hand, there are acts of harassment a supervisor might commit which might be the same acts a co-employee would commit, and there may be some circumstances where the supervisor's status makes little difference.
>
> [Ellerth, 524 U.S. at 763, 118 S. Ct. at 2269, 141 L. Ed. 2d at 654.]

In reconciling the test of Restatement § 219(2)(d) with Meritor's rejection of strict liability, the Supreme Court embraced the second alternative: the recognition of an

33

affirmative defense.  Id. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655; Faragher, supra, 524 U.S. at 805-06, 118 S. Ct. at 2290, 141 L. Ed. 2d at 686.  In so doing, the Supreme Court emphasized the legislative goal of deterring sexual harassment by promoting responsible efforts by employers to detect, address, and punish it.  Ellerth, supra, 524 U.S. at 764, 118 S. Ct. at 2270, 141 L. Ed. 2d at 654; Faragher, supra, 524 U.S. at 805-06, 118 S. Ct. at 2290, 141 L. Ed. 2d at 686.  As this Court construed the LAD in Lehmann, the Supreme Court held that the "'primary objective'" of Title VII was "not to provide redress but to avoid harm."  Faragher, supra, 524 U.S. at 805-06, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688 (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 95 S. Ct. 2371, 5 L. Ed. 2d 280, 296 (1975)); see also Lehmann, supra, 132 N.J. at 625-26.  The Court noted in Faragher, supra, the advice of the United States Equal Employment Opportunity Commission (EEOC) to employers to "'take all steps necessary to prevent sexual harassment from occurring, such as . . . informing employees of their right to raise and how to raise the issue of harassment.'"  524 U.S. at 806, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688 (quoting 29 C.F.R. § 1604.11(f) (1997)); see also Ellerth, 524 U.S. at 764, 118 S. Ct. at 2270, 141 L. Ed. 2d at 654.

Given the clear objective of Title VII to prevent sexual harassment in the workplace, the Supreme Court arrived at the

34

conclusion that was reached by this Court in Lehmann, Cavuoti and Gaines: the imposition of strict liability on an employer when it has taken no tangible employment action against the plaintiff employee, without respect to that employer's efforts to foster a workplace free from harassment, would contravene the legislative goal of deterrence. Faragher, supra, 524 U.S. at 806, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; see Ellerth, supra, 524 U.S. at 764, 118 S. Ct. at 2270, 141 L. Ed. 2d at 654. The Supreme Court observed:

> It would therefore implement clear statutory policy and complement the Government's Title VII enforcement efforts to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty. Indeed, a theory of vicarious liability for misuse of supervisory power would be at odds with the statutory policy if it failed to provide employers with some such incentive.
>
> [Faragher, supra, 524 U.S. at 806, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; see also Ellerth, supra, 524 U.S. at 764, 118 S. Ct. at 2270, 141 L. Ed. 2d at 654.]

The Supreme Court identified another factor that was central to its analysis. Invoking "the general theory of damages," the Supreme Court observed that a complainant in a sexual harassment case "has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of [Title VII]." Faragher, supra, 524 U.S. at 806, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688

35

(quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231 n.15, 102 S. Ct. 3057, 3065 n.15, 73 L. Ed. 2d 721, 732 n.15 (1982)). It held that "[i]f the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so." Id. at 806-07, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; see also Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655.

In Ellerth and Faragher, the Supreme Court thus integrated the agency principles of Restatement § 219(2)(d) with the legislative objective of deterring sexual harassment by promoting effective anti-harassment policies. It adopted the following standard:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
>
> [Faragher, supra, 524 U.S. at 807, 118 S. Ct. at 2292-93, 141 L. Ed. 2d at 689; see also

36

> Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at
> 2270, 141 L. Ed. 2d at 655.]

The Supreme Court further commented that

> [w]hile proof that an employer had promulgated
> an anti-harassment policy with complaint
> procedure is not necessary in every instance
> as a matter of law, the need for a stated
> policy suitable to the employment
> circumstances may appropriately be addressed
> in any case when litigating the first element
> of the defense.
>
> [Faragher, supra, 524 U.S. at 807, 118 S. Ct.
> at 2293, 141 L. Ed. 2d at 689; Ellerth, supra,
> 524 U.S. at 765, 118 S. Ct. at 2270, 141 L.
> Ed. 2d at 655.]

We concur with the Supreme Court that the Ellerth/Faragher analysis provides a fair and practical framework for supervisor sexual harassment cases.[7] Consistent with the focus of Restatement § 219(2)(d) on the nexus between the employer's delegation of authority and the harassment, the Ellerth/Faragher affirmative defense may not be asserted "when the supervisor's harassment culminates in a tangible employment action, such as

---

[7] Relying on a selection of academic commentary disapproving the Ellerth/Faragher analysis, our dissenting colleagues ignore the many state appellate courts that have found the affirmative defense to provide an equitable and workable framework for supervisor sexual harassment claims based on a hostile work environment. Post at ___ (slip op. at 13-17), see, e.g., Bank One v. Murphy, 52 S.W.3d 540 (Ky. 2001); Frieler v. Carlson Mktg. Grp., 751 N.W.2d 558 (Minn. 2008); Parker v. Warren County Util. Dist., 2 S.W.3d 170 (Tenn. 1999); Waffle House, Inc. v. Williams, 313 S.W.3d 796 (Tex. 2010); Brittell v. Dep't of Corr., 717 A.2d 1254 (Conn. 1998); Natson v. Eckerd Corp., Inc., 885 So. 2d 945 (Fla. Dist. Ct. App. 4th Dist. 2004); Sangster v. Albertson's, Inc., 991 P.2d 674 (Wash. Ct. App. 2000).

discharge, demotion or undesirable reassignment." Faragher, supra, 524 U.S. at 808, 118 S. Ct. at 2293, 141 L. Ed. 2d at 689; Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655. No affirmative defense is available in such cases because "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation . . . . Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Ellerth, supra, 524 U.S. at 761-762, 118 S. Ct. at 2269, 141 L. Ed. 2d at 653-54.

In addition, the defense provides no protection to an employer whose sexual harassment policy fails to provide "meaningful and effective policies and procedures for employees to use in response to harassment." Gaines, supra, 173 N.J. at 317; see also Lehmann, supra, 132 N.J. at 626 (stating that the LAD requires an "unequivocal commitment from the top that [the employer's opposition to sexual harassment] is not just words[,] but backed up by consistent practice"); accord Faragher, supra, 524 U.S. at 806-07, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655. In short, the affirmative defense provides no benefit to employers who empower sexually harassing employees who take tangible employment actions against their victims,

employers who fail to implement effective anti-harassment policies, and employers whose policies exist in name only.

Conversely, the Ellerth/Faragher framework motivates employers and employees to accomplish the paramount objective identified by this Court in Lehmann:  the prevention of sexual harassment.  See Lehmann, supra, 132 N.J. at 625-26.  The prospect of an affirmative defense in litigation is a powerful incentive for an employer to unequivocally warn its workforce that sexual harassment will not be tolerated, to provide consistent training, and to strictly enforce its policy.  See ibid.; accord Faragher, supra, 524 U.S. at 806-07, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; Ellerth, supra, 524 U.S. at 764-65, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655.  The Ellerth/Faragher defense similarly motivates a complainant in a sexual harassment case to report the offense internally, and thereby enable his or her employer to take immediate action against a harassing supervisor or coworker.

In contending that we authorize employers to "hide behind a paper anti-discrimination policy," post at ___ (slip op. at 2), and permit defendants to "seek cover behind an ineffective anti-discrimination policy," post at ___ (slip op. at 4), our dissenting colleagues' rhetoric fundamentally mischaracterizes our decision.  So that the dissent's description of our opinion does not confuse employers, employees, counsel or trial courts

39

with respect to this pivotal issue, we restate: an employer that implements an ineffective anti-harassment policy, or fails to enforce its policy, may not assert the affirmative defense. See Faragher, supra, 524 U.S. at 806-07, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; Ellerth, supra, 524 U.S. at 764-65, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655.

Accordingly, we expressly adopt the Ellerth/Faragher analysis for supervisor sexual harassment cases in which a hostile work environment is claimed pursuant to the LAD, and no tangible employment action is taken. See Entrot v. BASF Corp., 359 N.J. Super. 162, 187 (App. Div. 2003) (anticipating adoption of Ellerth/Faragher affirmative defense, and holding that "there is no barrier to the application of a Title VII defense [based on Ellerth/Faragher] to an LAD action").[8]

---

[8] The Appellate Division opinion on which our dissenting colleagues rely, Schmidt v. Smith, 294 N.J. Super. 569 (App. Div. 1996), aff'd, 155 N.J. 44 (1998), is not to the contrary. Post at ___ (slip op. at 5). In its brief review of claims of direct liability under Restatement § 219(2)(b) and vicarious liability under Restatement § 219(2)(d), the Appellate Division simply summarized portions of this Court's discussion of these claims in Lehmann. See Schmidt, supra, 294 N.J. Super. at 578-79. Contrary to the suggestion of the dissent, the Appellate Division neither stated nor implied that Lehmann precludes the assertion of an affirmative defense to a claim of vicarious liability based on Restatement § 219(2)(d). Ibid. Although the dissent contends that the Appellate Division "pointed out that unlike supervisory liability," negligence claims permit an employer to present evidence of its due care giving rise to a defense, post at ___ (slip op. at 5), such a distinction is nowhere to be found in Schmidt. See Schmidt, supra, 294 N.J. Super. at 578-79.

40

In a hostile work environment sexual harassment case under the LAD in which the plaintiff alleges employer vicarious liability under Restatement § 219(2)(d), the plaintiff has the initial burden of presenting a prima facie hostile work environment claim. If no tangible employment action has been taken against the plaintiff, the defendant employer may assert the two-pronged affirmative defense of Ellerth and Faragher. To establish that defense, the defendant employer has the burden to prove, by a preponderance of the evidence, both prongs of the affirmative defense: first, that the employer exercised reasonable care to prevent and to correct promptly sexually harassing behavior; and second, that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm. See Faragher, supra, 524 U.S. at 807, 118 S. Ct. at 2293, 141 L. Ed. 2d at 689; Ellerth, supra, 524 U.S. at 746, 118 S. Ct. at 2262, 141 L. Ed. 2d at 644. The employee may rebut the elements of the affirmative defense.

Thus, in further proceedings in this case, including any summary judgment proceedings that may follow remand, the State may avoid vicarious liability under Restatement § 219(2)(d) by demonstrating by a preponderance of the evidence that the DOC exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that Aguas unreasonably failed

41

to take advantage of any preventive or corrective opportunities provided by the DOC, or to avoid harm otherwise.  See Faragher, supra, 524 U.S. at 807, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688; Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655.

V.

The second issue raised in this case, the definition of a supervisor for purposes of claims based on sexual harassment giving rise to a hostile work environment, is a pivotal factor in the application of the agency principles set forth in Restatement § 219(2)(d).  Liability under Restatement § 219(2)(d) predicated on a supervisor's misconduct raises a critical question of fact -- the parameters of the authority conferred on the alleged harasser and whether he or she is properly considered a supervisor.  See Restatement § 219(2)(d).

The Court in Lehmann did not expressly define "supervisor" for purposes of deciding vicarious liability sexual harassment cases under agency law.  It alluded, however, to the "power delegated to [a supervisor] to control the day-to-day working environment."  Lehmann, supra, 132 N.J. at 620.  Further, in the context of its discussion of punitive damages, the Court distinguished between a "supervisor" and the employer's "upper management."  Id. at 622-23.  The Court thus suggested that its concept of a supervisor, for purposes of the agency analysis

that it proposed, included a broader range of managers than the senior executives who set policy for an employer.  Id. at 623.

Similarly, in Cavuoti, supra, in which the definition of "upper management" for purposes of a claim for punitive damages was the primary issue, the Court cited federal authority for the principle that it is an alleged harasser's functional authority in the workplace, not simply his or her power to hire and terminate a subordinate, that defines his or her status as a "supervisor."  161 N.J. at 124-25.

In its role as the agency charged with the enforcement of Title VII, the EEOC provided guidance to employers regarding the meaning of the term "supervisor" for purposes of sexual harassment cases.  U.S. Equal Emp't Opportunity Comm'n, No. 915.002 Enforcement Guidance on Vicarious Liability for Unlawful Harassment by Supervisors 3-5 (June 18, 1999) [hereinafter "EEOC Guidance"], available at http://www.eeoc.gov/policy/docs/harassment.pdf.  Applying the Ellerth/Faragher analysis, the EEOC cautioned that the determination of whether an alleged harasser is a "supervisor" turns on job function, not job title, that it "must be based on the specific facts," and that a supervisor's authority "must be of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment."  Id. at 4.

43

The first of the two definitions of "supervisor" promulgated by the EEOC focuses on the supervisor's capacity to undertake the adverse employment decisions that, if made, bar an employer from invoking the Ellerth/Faragher affirmative defense. Under that definition, "[a]n individual qualifies as an employee's 'supervisor' if he or she is authorized to undertake tangible employment decisions affecting the employee." Ibid. The EEOC Guidance defines "tangible employment decisions" to include, but not to be limited to, "hiring and firing, promotion and failure to promote, demotion, undesirable reassignment, a decision causing a significant change in benefits, compensation decisions and work assignment," and "suspension" or other "progressive discipline." Id. at 4, 6-7 n.31. The EEOC explained:

> An individual whose job responsibilities include the authority to recommend tangible job decisions affecting an employee qualifies as his or her supervisor even if the individual does not have the final say. As the Supreme Court recognized in Ellerth, a tangible employment decision "may be subject to review by higher level supervisors." As long as the individual's recommendation is given substantial weight by the final decision maker(s), that individual meets the definition of supervisor.
>
> [Id. at 4 (footnote omitted).]

The EEOC's second definition of "supervisor" reflects the language of the second clause in Restatement § 219(2)(d), which

44

requires that the sexual harasser be "aided in accomplishing the tort by the existence of the agency relation." Restatement § 219(2)(d). Citing the lifeguard supervisor setting of Faragher, the EEOC deems "[a]n individual who is authorized to direct another employee's day-to-day work activities" as a supervisor, "even if that individual does not have the authority to undertake or recommend tangible job decisions." EEOC Guidance, supra, at 4. The EEOC stated:

> An individual who is temporarily authorized to direct another employee's daily work activities qualifies as his or her "supervisor" during that time period. Accordingly, the employer would be subject to vicarious liability if that individual commits unlawful harassment of a subordinate while serving as his or her supervisor.
>
> On the other hand, someone who merely relays other officials' instructions regarding work assignments and reports back to those officials does not have true supervisory authority. Furthermore, someone who directs only a limited number of tasks or assignments would not qualify as a "supervisor." For example, an individual whose delegated authority is confined to coordinating a work project of limited scope is not a supervisor.
>
> [Id. at 5.]

In Vance v. Ball State University, __ U.S. __, __, 133 S. Ct. 2434, 2443, 186 L. Ed. 2d 565 (2013), a closely divided United States Supreme Court adopted a substantially narrower definition of "supervisor" than that of the EEOC for purposes of employer vicarious liability in supervisor sexual harassment

45

cases.  There, the majority construed Ellerth and Faragher to envision not two definitions of the term "supervisor," but "a unitary category of supervisors, i.e., those employees with the authority to make tangible employment decisions."  Ibid.  It held:

> [A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."
>
> [Ibid. (quoting Ellerth, supra, 524 U.S. at 761, 118 S. Ct. at 2257, 141 L. Ed. 2d at 633).]

We decline to adopt the restrictive definition of "supervisor" prescribed by the Supreme Court majority in Vance.  In light of our fact-specific approach to sexual harassment cases, we respectfully disagree with the Supreme Court's rejection of the EEOC's definition of supervisor on the grounds that it relies "on a highly case-specific evaluation of numerous factors."  Ibid.  We agree with the EEOC that the term "supervisor," defined more expansively to include not only employees granted the authority to make tangible employment decisions, but also those placed in charge of the complainant's

46

daily work activities, accurately reflects the two different settings envisioned by Restatement § 219(2)(d).

Moreover, this broader definition comports with this Court's holding in Lehmann, in which the Court recognized the importance, in Restatement § 219(2)(d) sexual harassment cases, of a supervisor's authority to control the day-to-day working environment. Lehmann, supra, 132 N.J. at 132. It is also consistent with the holding in Cavuoti, in which the Court rejected the notion that only the power to hire and terminate a subordinate distinguishes a supervisor from a co-employee. Cavuoti, supra, 161 N.J. at 124-25. The EEOC definition takes into account the broad range of employer structures and factual settings in which sexual harassment occurs.

Most importantly, the more expansive definition of "supervisor" furthers the paramount goal of the LAD: the eradication of sexual harassment in the workplace. It prompts employers to focus attention not only on an elite group of decision-makers at the pinnacle of the organization, but on all employees granted the authority to direct the day-to-day responsibilities of subordinates, and to ensure that those employees are carefully selected and thoroughly trained.

In any additional proceedings in this case following remand, the question of whether McClish or Hill served as Aguas's "supervisor" should be determined in accordance with the

47

two definitions set forth by the EEOC.  Under that standard, the allegedly harassing employee should be considered a supervisor for purposes of Aguas's hostile work environment claim if either:  (1) he was authorized to undertake tangible employment decisions affecting Aguas; or (2) he was authorized by the DOC to direct her day-to-day work activities at Edna Mahan.

## VI.

 Finally, we consider Aguas's claim for punitive damages. The trial court premised its dismissal of Aguas's punitive damages claim on its determination that the record supported no claim for compensatory damages in this case and accordingly did not undertake a detailed analysis of the punitive damages claim. We briefly review the standard that governs such a claim.

A plaintiff asserting a punitive damages claim in a LAD case against a public entity such as the DOC must meet a high standard.  A public sector employer "whose egregious conduct violates the LAD may be held 'liable for punitive damages . . . only in the event of actual participation by upper management or willful indifference.'"  Lockley v. Dep't of Corr., 177 N.J. 413, 424 (2003) (quoting Cavuoti, supra, 161 N.J. at 117).  The plaintiff must prove egregious conduct on the part of the defendant by clear and convincing evidence.  Id. at 432 (citing L. 1995, c. 142, § 11); see also Lehmann, supra, 132 N.J. at 624-25 (quoting Leimgruber v. Claridge Assocs., 73 N.J. 450, 454

48

(1977)).  For such damages, "a higher level of culpability than mere negligence" is required.  Lehmann, supra, 132 N.J. at 626.

For purposes of this analysis, defining the employer's "upper management" is a fact-sensitive inquiry that does not "depend[] on labels or titles but on whether an employee possesses 'significant power, discretion and influence.'" Lockley, supra, 177 N.J. at 424 (quoting Cavuoti, supra, 161 N.J. at 123).  This Court has explained that

> upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers).  For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace. Obviously such instructions should be tailored to the facts of the case and might be accompanied by special interrogatories when several officers are presented as members of "upper management."
>
> [Cavuoti, supra, 161 N.J. at 128-29.]

Thus, this fact-sensitive inquiry requires consideration of the following:  (1) the employee's position in the employer's

49

hierarchy; (2) the employee's function and responsibilities; and (3) the amount of discretion the employee exercises. Lockley, supra, 177 N.J. at 424.

Although claims brought pursuant to the LAD are excluded from the statutory cap set by the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17 (PDA), in N.J.S.A. 2A:15-5.14, the PDA's "general requirements for procedural and substantive fairness are mandated." Baker v. Nat'l State Bank, 161 N.J. 220, 229 (1999). Pursuant to N.J.S.A. 2A:15-5.12(c), if the trier of fact determines that an award is appropriate in an LAD case against a public sector employer, it sets the amount of that award by considering all relevant evidence relating to the factors set forth in N.J.S.A. 2A:15-5.12(b), "the profitability of the misconduct to the defendant" and when the misconduct was terminated.[9]

Consequently, if the trial court is called upon to determine Aguas's punitive damages claim on remand, it should assess whether Aguas has shown by clear and convincing evidence that the DOC committed "egregious conduct," and if so, whether she has presented clear and convincing evidence that "upper

---

[9] A fourth factor identified in N.J.S.A. 2A:15-5.12(c), the defendant's financial condition, is generally not considered when the defendant is a public entity because it "does not further the goal of deterrence as it does in the private sector." Lockley, supra, 177 N.J. at 430-31.

management" either participated directly in sexual harassment, or showed "willful indifference." The court should also assess Aguas's claims in accordance with the PDA and this Court's holdings in Cavuoti and Lockley.

VII.

The judgment of the Appellate Division is reversed, and the matter is remanded for further proceedings in accordance with this opinion.

JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which CHIEF JUSTICE RABNER joins.

ILDA AGUAS,

    Plaintiff-Appellant,

        v.

STATE OF NEW JERSEY,

    Defendant-Respondent.


    JUSTICE ALBIN, dissenting.

    The majority opinion turns back the clock for employees victimized by sexual harassment in the workplace and gives greater protection to supervisors who abuse their authority to create a hostile work environment.  Today's decision tears down the central pillar of our landmark decision in Lehmann v. Toys 'R' Us, 132 N.J. 587 (1993), which announced that an employer would be vicariously liable for sexual harassment committed by one of its supervisors.  Lehmann allowed no quarter for supervisory sexual harassment and provided for no affirmative defense for the employer.  We said so in clear, unmistakable terms, leaving no doubt that under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, this State's workers had safeguards not present under federal law.

1

The Appellate Division, the United States District Court of New Jersey, and the New Jersey Supreme Court Committee on Civil Jury Charges all recognized that under Lehmann, when the supervisor is the sexual harasser, the employer has no affirmative defense and cannot hide behind a paper anti-discrimination policy. Civil Jury Charge 2.25 reaffirmed in 2013 what we said twenty years earlier in Lehmann -- that an employer is vicariously liable if a supervisor creates a hostile work environment through sexual harassment. Model Jury Charge (Civil) 2.25 "Hostile Work Environment Claims Under the New Jersey Law Against Discrimination (Sexual and Other Harassment)" (February 2013). Trial courts have been guided by that charge for eighteen years. The majority now says it was all a mistake.

I cannot pretend that the majority's retreat from Lehmann will not have real-life negative consequences for the targets of workplace discrimination. Going forward, sexually harassed employees -- mostly women -- will be less likely to find relief in our courts, and therefore will be less likely to take their grievances there.[1] And employers will have less incentive to use greater care in selecting supervisors who will enforce rather than violate anti-discrimination policies. This is not a sky-

---

[1] Lehmann's basic assumption is that women are the most frequent victims of sexual harassment in the workplace. See Lehmann, supra, 132 N.J. at 615.

2

is-falling prediction but a stark reality for anyone who understands what our jurisprudence was and what it has now become.

The Law Against Discrimination is one of New Jersey's most progressive legislative schemes. Under the LAD, vicarious supervisory liability was a critical remedy both in making discriminated employees whole and in deterring workplace harassment. Because the majority has abandoned that remedy without any compensating benefit, I respectfully dissent.

I.

In our landmark decision in Lehmann, supra, 132 N.J. at 615-25, we set forth the different pathways for employer liability under our LAD when an employee is subjected to a hostile work environment through sexual harassment. In cases involving a hostile work environment persisting through an employer's alleged negligence, we allowed for an employer to show that it exercised due care by effectuating an anti-discrimination policy accessible to employees. Id. at 621-22 (relying on Restatement (Second) of Agency § 219(2)(b) (1958)). However, we took a different approach when the supervisor was the perpetrator of sexual harassment. In that circumstance, we clearly stated that an employer would be vicariously liable for the supervisor's sexual harassment of a subordinate because the employer delegated to the supervisor the authority to control

3

the workplace. Id. at 620 (relying on Restatement (Second) of Agency, supra, § 219(2)(d)). The employer could not seek cover behind an ineffective anti-discrimination policy that did not deter a supervisor from misusing the power delegated to him.

In Lehmann, we stated that whether an employer is liable for the hostile work environment created by a supervisor controlling the day-to-day activities of an employee depends on how a factfinder decides four questions:

> 1. Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains?
>
> 2. Did the supervisor exercise that authority?
>
> 3. Did the exercise of authority result in a violation of the LAD?
>
> 4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?
>
> [Ibid.]

We further stated that "[w]hen the answer to each of those questions is yes, then the employer is vicariously liable for the supervisor's harassment under § 219(2)(d)." Ibid. In supervisory liability cases, Lehmann posed no fifth question asking whether an employer should be excused because of a purportedly effective anti-discrimination policy available to its harassed employees.

4

*Lehmann*'s simple formulation of employer supervisory liability was understood by our courts and by various Supreme Court Committees given the task of preparing a jury charge consistent with our holding in *Lehmann*.

Writing for the Appellate Division in *Schmidt v. Smith*, 294 N.J. Super. 569, 578 (App. Div. 1996), *aff'd*, 155 N.J. 44 (1998), Judge Keefe noted that the "*Lehmann* Court provided a check list for the determination of whether a supervisor who creates a hostile work environment was aided in accomplishing that tort by the power delegated to him or her to control the day-to-day working environment." Judge Keefe quoted the above four-question test in *Lehmann* and stated: "When the answer to each of these questions is yes, then the employer is vicariously liable for the supervisor's harassment under § 219(2)(d)." *Ibid.* (citing *Lehmann*, *supra*, 132 N.J. at 619). Judge Keefe pointed out that unlike supervisory liability, the standard governing sexual harassment negligence claims allows an employer to present evidence of due care, such as "some effective preventative mechanisms such as anti-harassment policies, formal and informal complaint structures and monitoring mechanisms." *Id.* at 579 (citing *Lehmann*, *supra*, 132 N.J. at 621).

The Supreme Court Model Civil Jury Charge Committee, comprised of preeminent judges and lawyers, has formulated and revised a supervisory-liability charge four times since 1997,

5

each time asserting that an employer has no defense to a supervisor's sexual harassment if the factfinder answers the four Lehmann questions in the affirmative. As recently as February 2013, the Model Civil Jury Charge Committee issued instructions on employer liability when a supervisor or non-supervisor creates the hostile work environment.[2] Civil Jury Charge 2.25 provides that an employer is liable "if it delegated to [the harassing supervisor] the authority to control the working environment and [the harassing supervisor] abused that authority to create a hostile work environment." Model Jury Charge (Civil) 2.25(4)(b). The jury is (and has been) provided with the following instructions:

> To prove that defendant [employer's name] is liable to plaintiff based on its delegation of authority to [name(s) of alleged harassing supervisor(s)], plaintiff must prove each of the following elements by a preponderance of the evidence:

_____

[2] Model Jury Charge (Civil) 8.49, which instructs the jury on supervisory sexual harassment, was approved by the Supreme Court Model Civil Jury Charge Committee in October 1997. Model Jury Charge (Civil) 8.49 "Supervisory Sexual Harassment" (October 1997). Model Jury Charge (Civil) 2.25, which instructs the jury on hostile work environment claims under the LAD, was approved by the Supreme Court Model Civil Jury Charge Committee in November 1999. Model Jury Charge (Civil) 2.25. Then, in 2000, the Committee revised the charge, based on Lehmann. Notices to the Bar, Updates to Model Civil Jury Charges, 159 N.J.L.J. 258, 258 (Jan. 17, 2000). The charge was revised again, in February 2013, to "address an employer's liability under the LAD for supervisory acts of sexual harassment." Notices to the Bar, Model Civil Jury Charges Updates, 213 N.J.L.J. 554, 554 (Aug. 12, 2013).

(1) That defendant [employer's name] delegated authority to [name(s) of alleged harassing supervisor(s)] to control the situation of which plaintiff complains; and

(2) [name(s) of alleged harassing supervisor(s)] exercised that authority; and

(3) [name(s) of alleged harassing supervisor(s)] exercise of authority resulted in unlawful harassment; and

(4) the authority delegated by defendant [employer name] to [name(s) of alleged harassing supervisor(s)] aided [name(s) of alleged harassing supervisor(s)] in harassing plaintiff.

If you find that the plaintiff has proved each of these elements, then defendant [employer's name] is liable for the alleged unlawful harassment. If any one of these elements is not proved, then defendant [employer's name] cannot be held liable based on its delegation of authority.

[Ibid.]

That charge has been given to juries for eighteen years. In Gaines v. Bellino, 173 N.J. 301, 313 (2002), we reaffirmed the basic formula found in this jury charge derived from Lehmann, never hinting that an affirmative defense applied to supervisory liability under the Restatement § 219(2)(d) approach. We did so even though Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662, 689 (1998) and Burlington Indus. v. Ellerth, 524 U.S. 742, 764-65, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633, 655 (1998), which

7

provide an affirmative defense to supervisory liability, were both on the books. In Gaines, supra, we only stated that when an employee alleges employer negligence in causing a hostile work environment, under Restatement § 219(2)(b), the employer can assert the affirmative defense that it had an anti-discrimination policy in place. 173 N.J. at 313-14.

Moreover, that Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 120-21 (1999), permits an affirmative defense to a punitive-damage claim against a company in a LAD case, in no way contradicts Lehmann's no-affirmative defense to a compensatory-damage claim involving supervisory liability, as the majority suggests. Nowhere in Cavuoti does the Court contravene the supervisory-liability test for compensatory damages crafted in Lehmann.

Last, if Cavuoti and Gaines stood for the proposition that an affirmative defense applies to vicarious supervisory liability -- as the majority asserts -- then it stands to reason that this Court in 1999 and 2002 would have directed the Model Civil Jury Charge Committee to amend the Model Charge to conform to that view. But that never happened. Only now does the majority give the directive to the Committee to amend the Charge to include an affirmative defense.

II.

8

In Lehmann, supra, we understood that we were pursuing our own path, a different path in construing the LAD as providing greater protection against workplace discrimination than that afforded by federal courts construing Title VII. 132 N.J. at 600-01, 603, 618-20. Indeed, we eschewed the standard set forth by the United States Court of Appeals for the Third Circuit for hostile work environment sexual harassment. Id. at 603. We stated:

> [W]e announce a new test in the hope of creating a standard that both employees and employers will be able to understand and one that employers can realistically enforce. We cannot overstate the importance we place on a test that allows employees to know their rights in a given set of circumstances and that allows employers to set policies and procedures that comply with that test.
>
> [Ibid.]

Importantly, in Lehmann, supra, we declined to follow the United States Supreme Court majority's decision in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). 132 N.J. at 618-21. Meritor, supra, refused to accept the notion that "an employer is strictly liable for a hostile environment created by a supervisor's sexual advances, even though the employer neither knew nor reasonably could have known of the alleged misconduct." 477 U.S. at 69-70, 106 S. Ct. at 2407, 91 L. Ed. 2d at 61. Rather than follow Meritor, in Lehmann, supra, we cited approvingly Justice Marshall's

9

concurrence (joined by Justices Brennan, Blackmun, and Stevens) on supervisory liability:

> [A] supervisor's responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions. Rather, a supervisor is charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace. There is no reason why abuse of the latter authority should have different consequences than abuse of the former. In both cases it is the authority vested in the supervisor by the employer that enables him to commit the wrong: it is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.
>
> [132 N.J. at 618-19 (quoting Meritor, supra, 477 U.S. at 76-77, 106 S. Ct. at 2410, 91 L. Ed. 2d at 65-66 (Marshall, J., concurring)).]

The United States Supreme Court in Faragher, supra, declared that it was bound to follow the majority decision in Meritor. 524 U.S. at 792, 118 S. Ct. at 2286, 141 L. Ed. 2d at 679. However, as pointed out, in Lehmann, supra, we did not adopt the reasoning in Meritor. 132 N.J. at 618-21. Therefore, we are not bound to follow Faragher in lock-step.

Faragher, supra, held that an employer is subject to strict "vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" when a tangible employment action is taken, "such as discharge,

10

demotion, or undesirable reassignment." 524 U.S. at 807-08, 118 S. Ct. at 2293, 141 L. Ed. 2d at 689. On the other hand, "[w]hen no tangible employment action is taken" -- for example, when the harassing conduct causes an employee to suffer a nervous breakdown or a severe psychiatric disorder -- Faragher allows an affirmative defense. See id. at 807, 118 S. Ct. at 2293, 141 L. Ed. 2d at 689. The affirmative defense comes into play if the employer can show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ibid. The Court came to the same holding in Ellerth, supra, 524 U.S. at 764-65, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655, which was decided on the same day as Faragher. Until today, the Ellerth/Faragher affirmative defense standard was foreign to our LAD jurisprudence.

Lehmann makes no such distinction between tangible employment actions and sexual harassment that may cause physical or psychological harm to the employee. Under Lehmann, supra, so long as the "employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment," the employer is liable for compensatory damages, whatever they may be. 132 N.J.

at 624. Thus, a supervisor who sexually harasses and psychologically breaks an employee will be liable for compensatory damages. Ellerth/Faragher cannot be squared with Lehmann.

The United States District Court of New Jersey knew that our approach in Lehmann was incompatible with Ellerth/Faragher. In Newsome v. Administrative Office of the Courts, 103 F. Supp. 2d 807 (D.N.J. 2000), the plaintiff asserted violations of Title VII and the LAD, alleging that she was sexually harassed by her supervisor at the Administrative Office of the Courts (AOC). Even in the wake of Ellerth/Faragher, Judge Greenaway stated that "[a]lthough the New Jersey Supreme Court frequently looks to Title VII jurisprudence in interpreting the LAD, it has adopted a slightly broader test than that of the Third Circuit for hostile environment harassment." Id. at 817 (citation omitted). Like Judge Keefe and the Supreme Court Model Civil Jury Charge Committee, Judge Greenaway read Lehmann as not providing an affirmative defense to supervisory liability for sexual harassment. Id. at 822. In a case in which an employer delegates to a supervisor the power to control the work environment, thus facilitating the harassing conduct, Judge Greenaway held that, under the LAD, "[t]he reasonableness of the AOC's actions in implementing anti-harassment policies is no defense to harassment committed because of the agency

12

relationship." Ibid. Judge Greenaway stated that if a jury answered affirmatively that the supervisor's actions "were sufficiently severe or pervasive to create a hostile work environment" and that the supervisor "was able to commit those acts because of the authority delegated him by the AOC," then "the AOC will be vicariously liable, irrespective of its anti-harassment policies." Ibid.

Judge Greenaway understood Lehmann's distinction between the LAD and Title VII's approach to supervisory liability. It is that important distinction that the majority paves over today.

### III.

Today's decision is at complete odds with the widely held view that the LAD, under Lehmann, provided greater protection than federal law in hostile work environment cases.[3] "The LAD is

---

[3] See Elliot M. Baumgart & David H. Ben-Asher, If You Don't Have a Grievance Procedure, Get One; U.S. Supreme Court Lays Down the Rules for Avoiding Employer Liability for Sexual Harassment by Supervisors, 153 N.J.L.J. 492, 496 (Aug. 3, 1998) ("The discussion in Lehmann of an employer's effective complaint mechanisms took place only in the context of the negligence ground for vicarious liability, in contrast to Faragher and [Ellerth] -- in which the existence of a complaint mechanism is clearly available as a defense to all the grounds for vicarious liability."); Lisa Manshel, Employer Liability for Supervisors' Sexual Harassment; Why Faragher and Ellerth Affirmative Defenses Shouldn't Apply Under the LAD, 160 N.J.L.J. 609, 609 (May 15, 2000) ("The proponents of [Ellerth/Faragher] seek to use this affirmative defense to escape liability under the less forgiving test set forth in Lehmann."); id. at 615 ("In actuality, the new affirmative defense is nothing more than a policy decision to

remedial social legislation whose overarching goal is to eradicate the 'cancer of discrimination.'" Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 108-09 (2010). Before today, we heralded this state's progressive anti-discrimination laws and jurisprudence. For example, in Alexander v. Seton Hall University, 204 N.J. 219, 222, 234-35 (2010), we refused to follow the United States Supreme Court's crabbed "framework for analyzing accrual and timeliness in Title VII wage discrimination claims" in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007), because that framework disadvantaged employees who suffered discrimination. We rejected "the sea change that would be effected were we to adopt the Ledbetter majority approach to wage discrimination claims under our LAD" in light of our settled case law. Alexander, supra, 204 N.J. at 234. We therefore allowed for a more expansive statute of limitations under the LAD for the filing of wage discrimination claims. Ibid. Yet, the majority in this case invites a "sea change" that will disadvantage sexually harassed employees in the workplace.

---

shield employers from liability despite the fact that their policies are not effective. This federal policy contradicts the intent of the New Jersey Legislature as understood in Lehmann.").

14

If the United States Supreme Court's interpretation of Title VII was not the gold standard in Alexander, then why here? First, the Ellerth/Faragher standard is not in keeping with our liberal construction of our LAD.  See Nini, supra, 202 N.J. at 108-09 (noting that LAD "should be liberally construed" because it "is remedial social legislation").  Second, the Ellerth/Faragher standard has received substantial criticism. One commentator has stated the Ellerth/Faragher standard creates a "risk that internal programs will be merely 'symbolic responses -- responses designed to create a visible commitment to law, which may, but do not necessarily, reduce employment discrimination.'"  Melissa Hart, The Possibility of Avoiding Discrimination:  Considering Compliance and Liability, 39 Conn. L. Rev. 1623, 1646 (2007) (quoting Lauren B. Edelman, Legal Ambiguity and Symbolic Structures:  Organizational Mediation of Civil Rights Law, 97 Am. J. Soc. 1531, 1542 (1992)).  Another commentator has expressed concern that "firms may utilize compliance systems simply as window-dressing to reduce the probability of legal liability without addressing the underlying behavior."  Timothy P. Glynn, Taking Self-Regulation Seriously: High-Ranking Officer Sanctions for Work-Law Violations, 32 Berkeley J. Emp. & Lab. L. 279, 312 (2011); see also Anne Lawton, Operating in an Empirical Vacuum:  The Ellerth and Faragher Affirmative Defense, 13 Colum. J. Gender & L. 197, 199

15

(2004) (noting that United States Supreme Court's approach "paved the way for the lower federal courts to interpret the affirmative defense in ways that further undermine, rather than facilitate, the goal of deterring sexual harassment in the workplace"); John H. Marks, Smoke, Mirrors, and the Disappearance of "Vicarious" Liability:  The Emergence of a Dubious Summary-Judgment Safe Harbor for Employers Whose Supervisory Personnel Commit Hostile Environment Workplace Harassment, 38 Hous. L. Rev. 1401, 1405 (2002) (stating that post-Ellerth courts are "manufacturing a dubious summary judgment safe harbor for employers").

The Ellerth/Faragher standard, moreover, is not the optimal method for discouraging sexual harassment in the workplace. See, e.g., Susan Bisom-Rapp, Bulletproofing the Workplace: Symbol and Substance in Employment Discrimination Law Practice, 26 Fla. St. U. L. Rev. 959, 972 (1999) ("[T]he implementation of symbolic policies and procedures in no way guarantees substantive change for members of the groups that EEO law is designed to protect.  In fact, symbolic policies and procedures may provide unjustified optimism that an organization is governed fairly."); Joanna L. Grossman, The Culture of Compliance:  The Final Triumph of Form over Substance in Sexual Harassment Law, 26 Harv. Women's L.J. 3, 71 (2003) ("Research suggests that the affirmative defense rewards compliance without

16

ensuring success."); Kimberly D. Krawiec, Organizational Misconduct:  Beyond the Principal-Agent Model, 32 Fla. St. U. L. Rev. 571, 574 (2005) ("[S]ome organizations may employ internal compliance structures primarily as a window-dressing mechanism that provides both market legitimacy and reduced organizational liability for agent misconduct."); Lawton, supra, 13 Colum. J. Gender & L. at 198 (expressing concern that courts should not "reward employers for 'file cabinet compliance.'").

Clearly, Ellerth/Faragher is not offering a better way than Lehmann for the victims of hostile work harassment, whether those victims are targeted because of their gender, sexual orientation, race, religion, or nationality.  If our civil jury charge on supervisory liability was so wrong because it gave victims of discrimination an unfair litigation advantage, one must wonder why it took our Court eighteen years to say so. Moreover, had the Legislature wanted to include an affirmative defense to supervisory liability in the wake of Ellerth/Faragher, it could have amended the LAD.  But it did not.

In short, neither precedent, nor experience, nor logic requires us to adopt a standard that is inferior to our own standard in Lehmann for supervisory liability in LAD hostile work environment cases.

IV.

17

Here are Aguas's assertions, which we must accept as true for summary-judgment purposes. The highest-ranking officer on the third shift at the Edna Mahan Correctional Facility repeatedly sexually harassed Corrections Officer Ilda Aguas. On one occasion, the shift commander solicited Aguas to go with him to a motel; on another, he sat on her lap and blew his whistle while grinding his pelvis into her in the presence of two of Aguas's supervisors.

In another incident, the shift commander pulled Aguas's hands behind her back up to her shoulder blades, bent her over a table with his genital area touching her buttocks, stating "What are you going to do?" In yet another incident, the shift commander danced around Aguas and blew his whistle as though she were a stripper. Two superior officers were present but did not intercede. Other unwanted encounters included the shift commander massaging Aguas's shoulders.

Aguas reported those egregious episodes of sexual harassment to a supervising lieutenant numerous times, and his response was that she should handle the matter herself. The supervising lieutenant took the position that he was "not going to lose [his] job by getting involved in this." If Aguas's account is true, the State is liable under Lehmann's supervisory-liability standard, regardless of whether Aguas made

18

a formal complaint pursuant to the Department of Correction's anti-discrimination policy.

Based on Aguas's account, one fair inference is that a climate of fear discouraged the reporting of sexual harassment against a high-ranking officer. Common sense tells us that when the supervisor is the sexual harasser and other superior officers look the other way, as alleged here, the anti-discrimination policy touted by the employer has failed. The additional hoops that the majority requires Aguas to jump through under the Ellerth/Faragher standard do not advance the goals of the LAD, which is to rid the workplace of discriminatory harassment. This case exemplifies, if the allegations are true, how supervisory harassment can beat down and belittle an employee, who may understandably believe that she has nowhere to turn but to the courts.

V.

In the end, this is a case about statutory interpretation, and our mission is to construe the LAD consistent with the Legislature's salutary goal of eradicating sexual harassment in the workplace. By imposing vicarious liability on the employer for a supervisor's sexual harassment, the Lehmann Court gave effect to its understanding of the Legislature's intent in passing the LAD. If the majority's interpretation of the LAD is

19

wrong, as I believe it is, the Legislature can still speak to the issue.

CHIEF JUSTICE RABNER joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO. __A-35___                          SEPTEMBER TERM 2013

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


ILDA AGUAS,

        Plaintiff-Appellant,

                v.

STATE OF NEW JERSEY,

        Defendant-Respondent.


DECIDED          February 11, 2015
_____Chief Justice Rabner_____      PRESIDING
OPINION BY _____Justice Patterson_____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____Justice Albin_____

| CHECKLIST | REVERSE/ REMAND | AFFIRM |
|---|---|---|
| CHIEF JUSTICE RABNER | | X |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 2 |