**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2885-18T2

SHANIQUE WELLS,

    Plaintiff-Appellant,

v.

AAA NORTH JERSEY,
DAVID HUGHES, President
in his official capacity and
individually, and CHARLES
SHOTMEYER, Chairman
of the Board,

    Defendants-Respondents.

_____

Submitted March 23, 2020 – Decided July 8, 2020

Before Judges Sabatino, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-3338-16.

Hunt, Hamlin & Ridley, attorneys for appellant (Ronald C. Hunt, of counsel and on the briefs).

DeCotiis, FitzPatrick, Cole & Giblin, LLP, attorneys for respondents (Susan E. Volkert, of counsel and on the brief; Gregory J. Hazley, on the brief).

PER CURIAM

Plaintiff Shanique Wells, formerly employed by AAA North Jersey (AAANJ), filed suit alleging claims under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, against AAANJ, its President David Hughes, and the Chairman of its Board of Directors Charles Shotmeyer. She appeals the Law Division's November 28, 2018 order granting defendants summary judgment dismissal of her LAD complaint and denying in camera review of documents prepared by defendants' counsel, and its January 23, 2019 order denying her motion for reconsideration.[1] Having reviewed the record in light of the governing legal principles, we reverse and remand in part.

I.

We summarize the following facts from the record, viewing "the facts in the light most favorable to [plaintiff,] the non-moving party." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (citing R. 4:46-2(c)).

---

[1] Wells does not appeal summary judgment dismissal of her CEPA claim; thus, we will not discuss the facts related to the claim, nor the judge's disposition of the claim.

A. Sexual Harassment Allegations

Wells was hired as a marketing manager at AAANJ in November 2013. At that time, Hughes was one of several Vice Presidents of the company and a member of its Board of Directors, and Shotmeyer was the Chairman of the Board of Directors. Wells was directly supervised by James Dugan, also a company Vice President and a member of its Board of Directors.

Wells alleges that soon after she was hired, she was subjected to inappropriate, sexually lewd behavior by Hughes. In anticipation of her going to a national AAA meeting, Wells claims Hughes asked her if she was going to meet with a woman named L.C.[2] Wells said she was, and alleges Hughes told her to "make sure [to] check out [L.C.'s] rack. She has a really nice rack[.]" When Wells returned from the meeting, she contends Hughes asked her if she met with L.C. and if she "check[ed] out [L.C.'s] rack, and what [she] thought of it." Wells stated she replied, "I know we don't know each other very well, but I don't do this at work. This is not what I do."

Wells stated she subsequently notified Dugan and L.C. of Hughes' remarks. Dugan allegedly told her to ignore Hughes because she did not have

---

[2] We use initials to protect the privacy of the alleged subject of sexually lewd comments.

 A-2885-18T2

to report to Hughes and that he would serve as a buffer between them. Wells also learned from Dugan that L.C. had filed a complaint about Hughes' behavior in the past and L.C. was advised to no longer work directly with Hughes. Wells did not, at that time, file a complaint with AAANJ's Human Resources Department (HR).

According to Wells, the next incident took place around a year later, in November 2014, when she went to Hughes' office to remind him she was waiting for some information from him. She alleged Hughes showed her a picture of a bikini-clad woman on his computer and told her to "check her rack out," declaring "that's a nice set." He also asked her how she thought she compared with the woman. Wells contends she again complained to Dugan, telling him:

> I'm not trying to -- I don't want to run to HR every time something is said to me that's inappropriate, because that's not who I am. I've never done it, I don't want to do it, but this dynamic has got to change, because I don't want to feel like every time I'm alone with -- he's going to say something or make me feel uncomfortable, as he continues to make me feel.

Wells stated Dugan replied he would "take care of it, and [she] believed him."

About three months later, in February 2015, Dugan emailed his concerns about Hughes to Shotmeyer in light of rumors that AAANJ's president was going to be forced out, Hughes was going to become president, and presumably

Dugan's own job may be in jeopardy. The email criticized Hughes' judgment, business decisions, and possible conflicts of interest, but did not report accusations of sexual harassment by employees against Hughes. In March, the rumors bore truth, as Hughes became President of AAANJ.

In May, Wells claimed Hughes' sexually lewd behavior happened again when:

> [They] were discussing a membership thermometer that [Hughes] asked our department to make so that we could see our progress toward our membership goal for the year. I presented him one -- with one earlier that he wasn't satisfied with. So, [he] said, "I'm going to come and I'll show you what I'm talking about."
>
>      . . . .
>
> He came to my office and presented me with two pictures.
>
>      . . . .
>
> The first one was of a thermometer. Then he took a second picture out and he said, "[w]hen I originally started to draw this, it started to look like something else." And there was what was seemingly a penis ejaculating. And then [he] said, "[t]his guy really reached his goal, if you know what I mean." And he laughed.

A-2885-18T2

Wells stated she balled the picture up and threw it in a garbage can. She later retrieved it and presented it to Dugan, telling him she couldn't "keep doing this." Dugan told her he would "take care of it."

On July 1, Wells was promoted to Director of Marketing. Later that same month, she contended Hughes inappropriately felt up her leg when the two were momentarily talking alone in a breakroom. Wells stated the next morning she reported the incident as well as the penis drawing incident to Kathy D'Amico, AAANJ's HR Manager. Wells alleges she was told HR could not do anything about Hughes' behavior because HR reported to him. Dugan also discussed an incident where Hughes touched Wells' leg, stating he was present, but he couldn't recall where the incident took place.[3] He believed Wells probably informally complained about the incident without filing a formal complaint.

Wells contended another incident took place on July 16. She was conducting a meeting with two other employees while sitting on a folding table facing the door when Hughes walked into the room asking "[i]s that an invite[]" while raising an eyebrow and making a thrusting motion with his pelvis. Wells

---

[3] In her deposition, however, Wells stated nobody else was present during the incident.

maintains she jumped off the table and promptly adjourned the meeting. Dugan acknowledged Wells told him about this incident and he told her to document it.

A week later, on July 22, Wells stated she advised D'Amico and her assistant about the many instances that Hughes sexually harassed her. D'Amico, Wells recalled, reiterated that HR had no authority to address her complaints against Hughes, suggesting there was nothing HR could do about his behavior.

B. Reassignment/Resignation

Sometime in April 2016, Wells claims she advised Dugan that Hughes told her he cosigned a student loan for the daughter of an AAANJ board member. Wells thought this was inappropriate and possibly contrary to the company's conflicts of interest policy. Dugan, agreeing with her, advised Shotmeyer of the situation.

When Wells was later confronted in her office by an upset Hughes who threatened to "write [her] up for missing an e-mail," she informed Dugan. Dugan, according to Wells, advised her the confrontation was caused "because the matter of a student loan was either going to be discussed or had been discussed with the board, and he's really pissed off at you and at me." However, there is no official indication if the AAANJ Board of Directors addressed the allegation or determined whether Hughes violated company policy.

A-2885-18T2

In May, Wells contended she made a complaint against a co-worker, Jim Pereira. She explained:

> Pereira was told through whatever means . . . that they were demoting him and making me the vice-president of marketing and the branches, basically phasing him out as they had done with a few other managers. He became very, very upset about that despite . . . Dugan and myself telling him . . . it's not true. . . . As a result our dynamic shifted considerably. I don't know what happened other than that, but our dynamic shifted considerably, and it became a situation where we just had trouble working together. We were in meetings where [Hughes] had to literally tell him he had to behave professionally towards me because he was very nasty to me. It's documented. It turned into a very nasty situation, because it became the tenured legacy employees versus the new employees, and that was the environment.

After Wells was confronted by Hughes about missing an e-mail, she claimed she was placed under the supervision of Pereira as retaliation for reporting Hughes' co-signing of the student loan. In a June 8 email to Hughes, Wells sought clarification of any changes to her role and the impact on her ability to work from home, which was a condition upon which she accepted employment with the company. That same day, she also complained about the reassignment in an email to Shotmeyer; expressing her concern she would be required to report to Pereira, who is "historically combative and hostile towards" her and is "routinely unprofessional." In an email to Wells the next day, Hughes

8

informed her there would be no change in her role, but as far as her working remotely, he would need to determine if there was any such agreement with her old supervisors, including Dugan, to work from home, and he would discuss the matter with her when she returned.

Wells never reported to Pereira. On June 10, she gave notice she was taking a leave of absence, retroactive to June 7, due to a serious health condition. Over a month later, her counsel notified Shotmeyer she was anticipating filing a lawsuit due to the hostile work environment created by Hughes' sexually lewd conduct and his retaliation to her complaints regarding his conduct. On November 25, Wells resigned from AAANJ.

After Wells notified Shotmeyer she was planning to file suit, AAANJ's counsel interviewed Dugan, asking him if he believed from his sexual harassment training that Hughes had sexually harassed plaintiff.[4] Dugan responded:

> I'm not sure I don't know – part of the reason I hesitate is because I'm foreseeing something else happening to me where I'm not going to have a job now because I again spoke up against [Hughes] so it gives me some pause to be honest with you in three weeks away I'm

---

[4] The interview was apparently surreptitiously recorded by Dugan and provided to plaintiff's counsel after Dugan was served with a subpoena.

having another baby and I've already had enough I'm not interested in losing my job now.

. . . .

It's I mean I don't know.

. . . .

I'm hesitant to answer.

Dugan's employment at AAANJ eventually ended; the record does not indicate when or why.[5]

C. AAANJ'S Investigation

In September 2016, the same month Wells filed her lawsuit, AAANJ's counsel investigated her allegations. Dugan was interviewed regarding his knowledge about Wells' complaints, and he acknowledged knowing about the penis drawing incident but was not sure when it happened. He claimed he advised Wells to document her complaint in a formal memo, but she did not do

---

[5] On December 6, 2017, Dugan filed a five-count complaint in the Law Division against defendants alleging claims for hostile work environment, retaliation, failure to accommodate, and aiding and abetting under the LAD, and intentional infliction of emotional distress. The complaint was removed to the District Court of New Jersey, but later remanded back to the Law Division. After initially ordering Dugan's complaint and Wells' complaint be consolidated if it was sent back to state court, the trial judge reconsidered his order following the remand and did not consolidate the complaints.

so. He said he reported the incident to D'Amico, who told him there was nothing she could do because HR reported to Hughes in his capacity as company President.

Dugan stated he was asked by Shotmeyer if he knew anything about the concerns regarding Hughes' behavior towards women in the office because Hughes had propositioned a woman contractor with the company to "go to his place." Dugan said he told Shotmeyer about the incidents regarding L.C. and the penis drawing.

## II.

On September 22, 2016, Wells filed a three-count complaint against defendants alleging gender/sexual harassment and sexual discrimination in violation of the LAD, and retaliation in violation of the CEPA.

On January 12, 2018, Wells moved for an order granting leave of court "to propound interrogatories outside of Forms A, B, and C . . . in a manner consistent with the interrogatories propounded by the [d]efendants and responded to by . . . [her]." In her merits brief, Wells contends she "requested the [p]roduction of [d]ocuments from . . . [d]efendants which included any documents or statements made by any witnesses to the alleged harassment."

A-2885-18T2

Defendants responded to Wells' request for documents with general objections and limitations, noting that any documents they had were privileged, and "following a thorough review by outside legal counsel for . . . AAA[NJ], . . . which was conducted in anticipation of litigation . . . it was concluded that the allegations made by [Wells] were entirely false."

Despite Wells' request to extend discovery ninety days, discovery ended on July 31 and her counsel still sought responses to incomplete discovery. Wells specifically sought defendants' counsel's investigative materials to determine whether the company breached its duty to perform an adequate investigation. Defendants' counsel advised she would not be responding to discovery requests because discovery had ended, and investigation documents were the work of outside counsel hired in anticipation of defending against Wells' lawsuit.

With trial scheduled for October 22, defendants moved for summary judgment on August 24. The trial date was adjourned pending the Civil Presiding Judge's ruling on Dugan's motion to consolidate his and Wells' complaints. On July 27, Wells submitted a letter to the trial judge requesting the discovery end date be extended by ninety days if the court decided to consolidate her complaint with Dugan's complaint against AANJ, pursuant to its February 2, 2018 order. After summary judgment oral argument on October 15,

12

the judge reserved decision pending the rulings on the consolidation motion. The Civil Presiding Judge denied Dugan's motion to consolidate on October 26.[6]

On November 28, the judge entered an order and placed his oral decision on the record, granting summary judgment dismissal of Wells' complaint. Beyond mentioning the LAD and the CEPA, the judge's decision did not cite any law. In dismissing Wells' LAD hostile work environment sexual harassment claim, the judge stated she was required to prove retaliatory action and failed to do so because she had effectively quit her job rather than report to her new supervisor, Pereira. The judge determined Wells failed to establish her employment conditions met that standard. Regarding Wells' request[7] to compel discovery and have the judge conduct an in camera inspection of AAANJ's counsel's investigation documents, the judge determined it was immaterial because continued discovery to prove she was sexually harassed would not have overcome her failure to show an adverse employment action.

Wells later moved for reconsideration, arguing she was not required to prove she suffered an adverse employment action as a prima facie element of

---

[6] Dugan's motion for reconsideration was denied on December 6.

[7] Wells request was presented to the trial judge in her opposition to summary judgment.

A-2885-18T2

her LAD hostile work environment sexual harassment claim. After oral argument, the judge issued his oral decision denying reconsideration. The judge initially pointed out there was a question concerning whether the motion was filed within the twenty-day requirement of Rule 4:49-2, but rather than deciding the motion on procedural grounds, he addressed the merits of the motion.[8] He then stated "looking at the allegations, giving [Wells] the benefit of assuming these allegations to be accurate, I don't believe that the allegations reflect conduct on the part of . . . defendant[s] that is sufficiently severe or pervasive to allow a reasonable jury to conclude that there was a hostile work environment." The judge also maintained he didn't believe Wells "demonstrated anything that would suggest that an adverse employment action was taken."

## III.

We address Wells' arguments on appeal in the order presented. Before doing so, we point out her last argument – that the trial judge erred in denying her motion for reconsideration – need not be addressed because the argument and law pertaining to that motion are fully addressed in resolving her

---

[8]  Wells contended she attempted to file a motion for reconsideration on December 18 but was prevented from doing so by the eCourts system. In a letter to the court dated December 21, Wells explains the submission issue, and advises the motion was filed as a new matter with a comment to reference the preexisting case.

contentions related to the judge's initial decision granting summary judgment to defendants.

A.

Hostile Work Environment Claims

Wells argues the judge misinterpreted the LAD as articulated in Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 601 (1993) and its progeny, in dismissing her hostile work environment sexual harassment claim. Specifically, the judge wrongly determined she was required to show she "in any way suffer[ed] adverse employment retaliatory activity at the hands of . . . defendant[s,]" and wrongly applied the more rigorous "severe and pervasive" test required to prove a constructive discharge allegation, instead of the "severe and pervasive" test needed to sustain a hostile work environment sexual harassment claim under the LAD. Citing Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 26-29 (2002), Wells contends the judge's application of the more rigorous "severe and pervasive" test for constructive discharge claims compared to sexual harassment claims, runs contra to how courts should address both claims when found in the same case. She argues that in Shepherd, our Supreme Court explained even when there is an absence of "severe and pervasive" facts to prove constructive discharge, facts may still exist to sustain a hostile work environment claim. Ibid.

15

Defendants contend Hughes' conduct was not severe or pervasive enough to be actionable under the LAD. Citing Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 183-88, 199 (2008) (holding repeated date requests and small gift offerings by elderly tenant of the Seminary's apartment to two Seminary students did not involve the type of conduct actionable under the LAD), they contend Hughes' alleged behavior, at worst, would be considered "offensive utterances" that reflect a lack of workplace decorum. Under the circumstances here, such a defense is without merit.

The LAD is remedial legislation enacted to prohibit unlawful employment practices and discrimination in the form of harassment, "based on race, religion, sex, or other protected status, that creates a hostile work environment." Lehmann, 132 N.J. at 601; see N.J.S.A. 10:5-12(a). The LAD provides:

> It shall be an unlawful employment practice, or, . . . an unlawful discrimination:
>
> a. For an employer, because of . . . sex . . . of any individual . . . to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]
>
> [N.J.S.A. 10:5-12(a).]

As our Supreme Court pointed out in Lehmann, the LAD does not contain any provision specific to sexual harassment, and "[t]he legislative history of the

16

LAD is silent on" the subject. 132 N.J. at 600. However, noting the LAD closely tracks its federal counterpart, Title VII of the Civil Rights Act of 1964, the Court held "[s]exual harassment is a form of sex discrimination that violates . . . the LAD." Id. at 600-01 (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 555–56 (1990)). The "[l]oss of a tangible job benefit is not necessary for a hostile work environment claim because the harassment itself affects the terms of conditions of employment." Shepherd, 174 N.J. at 28.

To prove a hostile work environment sexual harassment claim under the LAD, a plaintiff must show:

> [T]he complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. When the harassing conduct is sexual or sexist in nature, as when a plaintiff alleges that she has been subjected to sexual touchings or comments, the first element will automatically be satisfied. However, a LAD plaintiff is also compelled to prove that the harassing conduct, not its effect on the plaintiff or on the work environment, was severe or pervasive. To satisfy the third and fourth factors, a LAD plaintiff must show that her working conditions were affected by the harassment to the point at which a reasonable woman would consider the working environment hostile.

A-2885-18T2

[Griffin v. City of E. Orange, 225 N.J. 400, 413-14 (2016) (citations and quotation marks omitted).]

The first element is satisfied by Wells because she alleged she was subject to sexual touching and lewd comments. As to elements two through four we review them interdependently because "[o]ne cannot inquire whether the alleged conduct was 'severe or pervasive' without knowing how severe or pervasive it must be." Lehmann, 132 N.J. at 604. Wells must thus show the conduct was "severe or pervasive enough to make a reasonable woman believe that the conditions of employment are altered and her working environment is hostile." Ibid. In considering the severity and pervasiveness of the conduct, we are instructed to "consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'" Id. at 607 (quoting Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992)).

Although case law regarding specific conduct which rises to actionable sexual harassment under the LAD is sparse, Lehmann, 132 N.J. at 595-97, and Griffin, 225 N.J. at 406, both describe unwanted kissing and sexual advances rising above the sexual and crass jocular behavior described by Wells. In Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995), a Title

VII sexual harassment case, the Seventh Circuit Court of Appeals provides that close calls regarding whether conduct constitutes a severe and pervasive hostile work environment should be a question for a jury, declaring:

> [T]he line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing. It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other; and when it is uncertain on which side the defendant's conduct lies, the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error.
>
> [(citations and quotations omitted).]

In that same vein, our Supreme Court has held, in hostile work environment cases, whether rude and obnoxious behavior is severe or pervasive enough to be actionable, is a jury question, precluding summary judgment. See Cutler v. Dorn, 196 N.J. 419, 436 (2008) (finding whether anti-Semitic jokes and remarks made by co-workers to a Jewish police officer were severe or pervasive enough to be actionable under the LAD was properly heard by a jury).

Viewing Wells' allegations as true under our summary judgment standard, Holmes v. Jersey City Police Dep't, 449 N.J. Super. 600, 602-03 (App. Div. 2017), she accused Hughes of: (1) telling her to admire L.C.'s breasts when she saw L.C. at a convention; (2) asking her after the convention what she thought

of L.C's breasts; (3) stating he admired the breasts a bikini-clad woman he showed her on his computer, and asking her how her breasts compared with the woman's breasts; (4) showing her a picture he drew simulating an ejaculating penis; (5) touching her leg inappropriately when they were in a breakroom; and (6) walking into a room where she was sitting on the edge of a desk surrounded by colleagues, and making a thrusting motion with his pelvis, after raising an eyebrow and asking if her position was an invite. We conclude a jury should decide if such alleged conduct over the course of two-and-a-half-years is deeply offensive and sexually harassing enough to make a reasonable woman believe her workplace environment is hostile. Wells did not have to prove that her employment was adversely affected beyond the fact that Hughes' behavior was severe and pervasive sexual harassment. Thus, the judge erred in finding Wells did not prove a prima facie LAD claim to avoid summary judgment.

B.

Direct/Vicarious Liability as to AAANJ and Shotmeyer

In determining Wells' LAD claims should be dismissed on summary judgment grounds because she failed to prove an adverse employment action, the judge did not rule on whether AAANJ and Shotmeyer could be held negligent and reckless for having poor policies and procedures or vicariously

20

liable for Hughes' conduct. Under certain circumstances, in accordance with Rule 2:10-5, we "may exercise such original jurisdiction as is necessary to the complete determination of any matter on review." Because our review is de novo, and the issue has been fully briefed and orally argued, we perceive no need to remand this issue to the trial court and will address it in the interests of judicial economy. See e.g., Marion v. Borough of Manasquan, 231 N.J. Super. 320, 330 (App. Div. 1989) (exercising original jurisdiction where resolution of the issue "is necessary for a complete determination and the facts necessary to resolve it are present in the record") (citing R. 2:10-5)).

To establish AAANJ's policies and procedures were sufficient and adhered to, AAANJ and Shotmeyer point to the policies in place during the time Wells was allegedly harassed; the training Wells received regarding those polices; and the complaints by other employees and Wells that were properly addressed. They therefore argue a structure was in place at AAANJ to thoroughly and effectively handle complaints of harassment, and if Wells had legitimate complaints of harassment or discrimination, she clearly failed to take advantage of AAANJ's available structure.

AAANJ's policies and procedures regarding sexual harassment are detailed in a document titled "NON-HARASSMENT POLICY," which provides:

> We want all employees to know that they can work in security and with dignity, and are not required to endure insulting, degrading or exploitative treatment. The [c]ompany will not tolerate harassment of its employees on the basis of . . . sex . . . and strongly disapproves of all forms of sexual harassment. All employees have a right to be free from discrimination in their work environment, including freedom from sexual harassment. Any violation of this policy by any employee will result in discharge or other disciplinary action.
>
> [E]ngaging in other sexually harassing or offensive conduct or creating offensive or hostile conditions in the workplace is prohibited on the part of all employees. Sexual harassment includes, among other things, . . . unwanted physical contact, as well as other verbal or physical conduct of a sexual nature such as epithets, jokes and insults, or any other unwelcome conduct of a sexual nature. Abusing the dignity of an employee through unwelcome jokes or derogatory comments creating a hostile work environment will also not be tolerated.
>
> If an employee feels this policy has been violated in any way, the employee should immediately report the matter to the President. Any communication pursuant to this policy will be maintained in the strictest confidence, to the extent possible under the circumstances. An employee need not be the actual target of harassment to bring any matter to the attention of the President.

22

AAANJ and Shotmeyer also contend it conspicuously displayed notices advising employees of their rights under Title VII and the LAD.  Proof their employees were properly trained regarding those laws, is evidenced in Wells' signing a "receipt of employee guide" on November 1, 2013, which contained the company's non-harassment policy.  She also completed training for "preventing sexual harassment" and "preventing discrimination," on December 7, 2015.[9]

AAANJ and Shotmeyer presented several instances where Wells used its harassment policy to file complaints and those complaints were properly addressed.  Wells made a complaint to HR about an unpleasant interaction with a mail room employee, which was addressed when Jim Dobi, an AAANJ Vice-President at that time, wrote an email providing that he "talked to [the employee] and gave him a verbal warning."  Wells also filed a formal complaint about another AAANJ employee, which resulted in an investigation by an outside counsel and a finding the employee was insubordinate, but her conduct did not constitute a hostile work environment because her actions were not based on Wells' protected status.  In addition, Wells sent emails to Pereira and Dugan,

---

[9] Dugan completed similar training on September 27, 2010, November 27, 2013, and November 6, 2015.

following up on a previous complaint about a AAA branch manager. The record does not indicate how that complaint was resolved.

To substantiate its position that Wells and Dugan never reported Hughes' harassing conduct, defendants rely upon the certification of D'Amico, whom Wells and Dugan contended they complained to. D'Amico's stated:

> If [Wells] had reported to me that she was sexually harassed and/or discriminated against by Mr. Hughes I would have immediately prepared a write-up and placed it in [Wells'] employee file, as is my usual practice. . . . Additionally, I would have immediately reported the complaint to my supervisor at the time, [AAANJ] Vice President Jim Dobi, to determine whether the matter should be referred to the Board of Directors (in light of the fact that Mr. Hughes was President of AAANJ) for further investigation.

D'Amico also certified she denied ever being notified by Wells or Dugan about any sexual harassment or discrimination regarding Hughes. She further asserted the claims by Wells and Dugan, that she told them there was nothing she could do because Wells reported to Hughes, did not make sense given Dobi had always been her direct supervisor.

Wells argues AAANJ and Shotmeyer are not entitled to summary judgment on negligence and vicarious liability claims because she presented sufficient evidence showing AAANJ's policies and procedures were deficient because: (1) all complaints of harassment were "required to go through" Hughes,

the alleged harasser; (2) there were complaints about Hughes' conduct from other women and his misconduct persisted; (3) other managers and higher level employees that were trained in AAANJ's policies and procedures were aware of the conduct and failed to take corrective action; and (4) AAANJ failed to monitor its policies, as shown by Dugan's concern of retaliation if he disclosed his thoughts about Hughes' conduct. Wells also maintains if the court disagrees that the evidence bends in her favor, there were: (1) factual disputes as to the effectiveness of AAANJ's harassment policies and procedures, and (2) factual disputes as to whether she complained about Hughes and that AAANJ and Shotmeyer failed to affirmatively defend her from Hughes' sexual harassment.

Wells asserts that in evaluating the effectiveness AAANJ's sexual harassment policy, a court is to assess the "complaint structures for employees' use, both formal and informal in nature." Gaines v. Bellino, 173 N.J. 301, 312-14 (2002). She contends the argument that she did not submit a formal or written complaint to HR is not determinative as to the merits of her claims, but it does speak to the effectiveness of AAANJ's policies and procedures in combating sexual harassment. Id. at 317-18 ("The County's defense to this cause of action has been to focus attention on plaintiff's failure to file a formal complaint. That alone is insufficient to entitle defendants to an affirmative defense insulating the

County from liability for an alleged hostile work environment caused by one of its highest ranking officers.").

Wells argues AAANJ and Shotmeyer failed to monitor the effectiveness of its anti-harassment policies, pointing to Dugan's fear in stating whether he believed Hughes sexually harassed her. She contends the ineffectiveness of the policies and procedures is borne out by the lack of any action taken to prevent Hughes' ongoing conduct despite her complaints reaching Dugan, her immediate supervisor, Shotmeyer, the chairman of the board, and other senior level employees, all of whom were trained in AAANJ's policies and procedures. Wells points out when she complained to HR she was told the department could not do anything about the allegations because it reported to Hughes.

Wells also contends there were other instances of harassment by Hughes toward other personnel and "[e]vidence of sexual harassment directed at other women is relevant to both the character of the work environment and its effects on the complainant." Lehmann, 132 N.J. at 611. In particular, Wells states Dugan identified two women who complained about Hughes to HR, however it is unknown if the complaints were regarding sexual harassment. Dugan also explained that Shotmeyer had told him Hughes had propositioned a female contractor for the company.

Wells contends she has presented a prima facie LAD claim against AAANJ under a vicarious liability cause of action because Hughes can be considered her supervisor under this claim and AAANJ failed to affirmatively protect her from him.

When a plaintiff establishes sexual harassment by a supervisor or co-worker, under certain circumstances, the employer can be held liable for the harassing conduct. Aguas v. State, 220 N.J. 494, 509-10 (2015); Lehmann, 132 N.J. at 615-16. A plaintiff has two causes of action for employer liability, "a direct cause of action against the employer for negligence or recklessness under [Restatement (Second) of Agency § 219(2)(b)] . . . [and] a claim for vicarious liability under [Restatement (Second) of Agency § 219(2)(d)]" if the harasser was the plaintiff's supervisor. Aguas, 220 N.J. at 512 (citations omitted). "Although direct claims for negligence or recklessness under [Restatement (Second) of Agency § 219(2)(b)] and claims for vicarious liability under [Restatement (Second) of Agency § 219(2)(d)] are often discussed in tandem, they are analytically distinct from and independent of one another." Ibid. Therefore, "the two claims must be addressed separately." Ibid.

"The negligence standard imposes on [a plaintiff] the burden to prove that the [defendant] failed to exercise due care with respect to sexual harassment in

27                                                                    A-2885-18T2

the workplace, that its breach of the duty of due care caused the plaintiff's harm, and that she sustained damages." Ibid. (citing Komlodi v. Picciano, 217 N.J. 387, 409 (2014); Robinson v. Vivirito, 217 N.J. 199, 208 (2014)). When a defendant challenges the sufficiency of a plaintiff's proofs of a Restatement (Second) of Agency § 219(2)(b) cause of action against an employer, the court, deciding a dispositive motion considering the claim, should consider five factors:

> (1) formal policies prohibiting harassment in the workplace; (2) complaint structures for employees' use, both formal and informal in nature; (3) anti-harassment training, which must be mandatory for supervisors and managers, and must be available to all employees of the organization; (4) the existence of effective sensing or monitoring mechanisms to check the trustworthiness of the policies and complaint structures; and (5) an unequivocal commitment from the highest levels of the employer that harassment would not be tolerated, and demonstration of that policy commitment by consistent practice.
>
> [Aguas, 220 N.J. at 513 (citing Gaines, 173 N.J. 313).]

Concurrently or alternatively, a plaintiff may assert a Restatement (Second) of Agency § 219(2)(d) claim. "[T]he plaintiff has the initial burden of presenting a prima facie hostile work environment claim." Id. at 524.

> If no tangible employment action has been taken against the plaintiff, the defendant employer may assert [a] two-pronged affirmative defense . . . . To establish

that defense, the defendant has the burden to prove, by a preponderance of the evidence, . . . that the employer exercised reasonable care to prevent and to correct promptly sexually harassing behavior[] and . . . the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

[Ibid. (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)).]

The employee may then rebut the elements of the affirmative defense. Ibid.

The affirmative defense is not available in cases where the supervisor's harassment has resulted in an adverse employment action, such as "undesirable reassignment," nor will the defense provide "protection to an employer whose sexual harassment policy fails to provide 'meaningful and effective policies and procedures for employees to use in response to harassment.'" Id. at 522 (citing Gaines, 173 N.J. at 317). "[A]n allegedly harassing employee is the complainant's supervisor if that employee had the authority to take or recommend tangible employment actions affecting the complaining employee, or to direct the complainant's day-to-day activities in the workplace." Id. at 500. A four-part test for the factfinder must then be applied. Id. at 514.

1. Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains . . . ?

2. Did the supervisor exercise that authority?

3. Did the exercise of authority result in a violation of [the LAD]?

4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?

If each of these questions are answered in the affirmative, "then the employer is vicariously liable for the supervisor's harassment under [Restatement (Second) of Agency] § 219(2)(d)."

[Ibid. (first alteration in original) (citations omitted).]

Under these principles, if Wells proves Hughes' lewd conduct occurred and she complained about them, which resulted in her reassignment to a less desirable position by reporting to a person whom she had previous complained about, AAANJ and Shotmeyer have no affirmative defense. If, contrary to those claims, they can prove by a preponderance of evidence that Hughes did not harass Wells and she made no complaints about him, they might prevail at trial. To prevail on a summary judgment motion to avoid vicarious liability for Wells' claims, AAANJ and Shotmeyer would be required to demonstrate there are no factual disputes concerning the fact-sensitive issues surrounding their affirmative defense. Simply asserting they did not know the President of their company was sexually harassing a subordinate is no defense. Moreover, since there are such disputes, they are not entitled to summary judgment for

negligence and vicarious liability related to Wells' hostile work environment due to sexual harassment. See Holmes, 449 N.J. Super. at 602-03.

IV.

The remaining issue involves Wells' argument that the judge abused his discretion by not conducting an in camera review of the documents prepared by defendants' outside counsel while conducting an investigation into Wells' allegations. It is unclear when in September 2016 defense counsel's interview with Dugan took place, but it appears that at the very least defendants were aware of Wells' intentions to sue them based upon Hughes' alleged behavior.

Based upon his review of a transcript of the secretly recorded interview Dugan gave to Wells' counsel under subpoena, the judge stated, "a fatal problem with this case and that isn't going to change even with more discovery, more depositions, more anything. [Wells] quit." The judge then stated that since Wells did not return to work after her leave of absence because she did not approve of being reassigned to report to Pereira, she "chose to quit for reasons known only to her, but absolutely not reasons that give rise to a cause of action in my opinion."

Wells, relying upon Payton v. N.J. Tpk. Auth., 148 N.J. 524, 532 (1997), argues Dugan's interview with defendants' counsel indicates AAANJ had

31

knowledge of Hughes' misconduct prior to the investigation into her allegations by outside counsel, and any documents regarding that prior knowledge would not be privileged. She contends the interview documents are not privileged and could be used to show AAANJ's policies and procedures were inadequate or that there was an adverse employment action taken against her.

Wells argues defendants should have acknowledged the existence of their counsel's interviews in response to her discovery requests and then claimed any asserted privilege so that any disputes could be raised before the judge. She maintains throughout the discovery period, defendants failed to acknowledge the existence of Dugan's statements and other documents in response to Wells' discovery requests. Wells contends defendants' counsel agreed to curb discovery to mediate the case and pursue the deposition of Dugan and others after the discovery end date. Wells argues it is apparent that if the interview of Dugan was not provided prior to his proposed deposition, defendants would be making the same arguments that they were unaware of Hughes' misconduct notwithstanding Dugan's admissions otherwise.

Defendants contend any information obtained from Dugan's interview or any other source is subject to the attorney-client and work-product privileges because it was only conducted in the anticipated litigation after Wells' counsel

sent notice of the potential lawsuit to Shotmeyer.  Citing <u>Pomerantz Paper Corp. v. New Cmty. Corp.</u>, 207 N.J. 344, 371 (2011) and <u>Bender v. Adelson</u>, 187 N.J. 411, 428 (2006), defendants argue Wells failed to move for an order to produce the documents or conduct an in camera review, therefore she cannot now argue to this court that the judge abused its discretion.

Defendants assert Wells' attempt to invoke <u>Payton</u> to argue the judge should have reviewed certain documents in camera is misplaced.  There, the Court held "if the purpose [of the attorney's actions] is to provide legal advice or to prepare for litigation, then the privilege applies." <u>Payton</u>, 148 N.J. at 551. Additionally, under <u>Miller v. J.B. Hunt Transp., Inc.</u>, 339 N.J. Super. 144, 150 (App. Div. 2001), any documents prepared by counsel are privileged work-product because the "dominant purpose in preparing . . . [them] was concern about potential litigation and the anticipation of litigation was objectively reasonable."

Defendants further argue Wells has not overcome the work product privilege, by showing "(1) that [s]he has a substantial need for the requested documents; and (2) that [s]he is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means."  <u>Medford v. Duggan</u>, 323 N.J. Super. 127, 136-37 (App. Div. 1999).

Based upon the judge's ruling, we surmise that because he had decided to grant summary judgment dismissal of Wells' complaint, he found it unnecessary to conduct an in camera review and determine under the controlling law whether Wells was entitled to any of the documents gathered by defendants' counsel's investigation. Consequently, in view of our remand, we vacate the judge's decision denying an in camera review and require the judge to review the documents in camera in accordance with the principles set forth in Pomerantz Paper, Payton and Medford, and any relevant case law or Rules of Court. Unless one has already been provided, defendants' counsel shall submit to the trial court a detailed privilege log identifying all disputed privileged communications to help aid the court in its review. In reviewing the documents, the judge should consider whether the privileges relied upon by defendants apply to preclude release to Wells. The judge should then issue his findings of facts and conclusions of law. We leave it to the judge's discretion whether to entertain additional briefing or argument.

V.

In sum, we express no opinion on whether Wells can prove a hostile work environment sexual harassment LAD claim against Hughes. We merely conclude the trial judge's order granting summary judgment to defendants

34

incorrectly determined Wells failed to establish a prima facie claim and was required to prove adverse employment action to sustain her LAD claim. We also express no opinion on whether AAANJ and Shotmeyer can establish a defense to direct and vicarious liability for Hughes' alleged behavior. Whether Wells suffered from a hostile work environment sexual harassment LAD claim due to Hughes' behavior, and whether AAANJ and Shotmeyer are directly or vicariously liable for that behavior, should be decided by a jury. In addition, the judge should conduct an in camera review of the documents prepared by defendants' counsel sought by Wells and determine if she is entitled to any of the documents. We take no position as to whether the documents should be released to Wells.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2885-18T2